THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JULIO ENRIQUE ROSARIO, Defendant-Appellant.

First District (4th Division)    No. 78-1109

Opinion filed July 12, 1979.

Ralph Ruebner and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Bruce Brandwein, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant was convicted by a jury of rape and deviate sexual assault of Norma C. and sentenced to serve six years in the Illinois

Department of Corrections. He has appealed, contending that the prosecutor's reference in final argument to defense counsel's having, in front of the jury, paged through the police reports and preliminary examination testimony without finding anything with which he could impeach Norma denied the defendant a fair trial in that it amounted to using prior consistent statements to buttress a witness' testimony. We affirm the conviction.

At trial, Norma, who was 17 at the time of the trial, testified that on June 30, 1977, she and a girlfriend, Gloria Pagon, went to the police station located at 89th and Exchange in Chicago at about midnight to check on a friend. The two girls left the station at about 12:30 a.m. and started to walk home. The defendant drove by and offered them a ride home. Norma had known the defendant for about six or seven years; at one time he had dated her sister. The defendant first drove Gloria home. He then drove to his house and went inside for a few minutes while Norma waited in the car. After returning to the car, the defendant asked her if she would pretend to be his wife so he could collect some money that was owed to him. She refused, saying she had to get home. However, the defendant drove to a forest preserve near 112th Street. He parked his car at a dead end in the forest preserve, got out of the car and went behind the bushes. He came back and told her to get out of the car. After she refused, he opened the passenger door and pulled her out of the car. She then saw that he was armed with a silver handgun. The defendant then performed the acts of cunnilingus and rape and forced her to commit an act of fellatio, which formed the basis of this conviction. At one point when Norma verbally resisted, the defendant grabbed her face and threatened her. After the attack defendant drove Norma to her mother's house. She was crying during the drive and defendant told her he would marry her if she became pregnant; he also threatened to harm her father if she said anything.

Norma's parents were divorced; she lived with her father. When the defendant left her at her mother's house, Norma told her mother that the defendant had raped her. She then called her father and told him the same thing. Her father took her to the police station, where a police report was filled out, and then to the hospital to be examined.

Norma testified that she had never had sexual intercourse with any person prior to June 30, 1977.

On cross-examination, Norma denied that she knew a person named "Joe" who drives a black vehicle. She also stated that prior to June 30, 1977, there were no hard feelings between her father and the defendant over the older sister's dating the defendant a few years before, but that the defendant stated he was paying her back for her sister.

Towards the end of the cross-examination the defense attorney asked

Norma if she remembered testifying on July 5, 1977, in Room 520. She answered yes. The defense attorney then asked for a moment. After a "short pause," as indicated in the record, he made no further reference to the July testimony. A few questions later the defense counsel also asked if it was true she "had conversations with police officers there about what you have told us, is that correct." When she answered yes, defense counsel continued "You told them substantially what you have told us, is that correct." Again Norma answered yes. Defense counsel, however, made no effort to impeach Norma's statements by showing that inconsistent statements were made either when she talked to the police or when she testified on July 5.

Gloria Pagon testified that she and Norma were offered a ride by the defendant, whom she identified in court, shortly after they left the police station. The defendant drove Gloria home at about 12:45 a.m. Norma was in the car at that time.

Norma's father testified that she called him at about 3 a.m. June 30, 1977, and told him the defendant raped her. She was crying and could not say anything else. He drove over and picked her up. She was crying and shaking and could not talk. He then took her to the police station and later to the hospital.

The last witness for the prosecution on direct was Dr. Carol Hurley who examined Norma when she was brought to the hospital. At that time she took smears from and examined both Norma's vagina and mouth. The entrance to Norma's vagina was smaller than normal. Dr. Hurley decided not to use even the smallest vaginal spectrum in her examination since, while it might have been physically possible to force it into the vagina, it would have been traumatic. Norma's hymen was intact. Dr. Hurley testified that while it is a little unusual to have a hymen intact after sexual intercourse, it is not unheard of. She saw no lacerations or contusions, but stated this was not unusual in a rape case; indeed, it was unusual to find signs of abuse in a rape case.

Dr. Hurley took swab samples from Norma's larynx and vagina. The oral sample showed no sperm while the vaginal smear did show sperm. There was also a stipulation that the smears taken from Norma's vagina were tested and found to contain human spermatozoa but that there were none in the oral smears.

The first witness for the defense was the defendant's wife, Sharon. Sharon testified that she looked out of her window at midnight on the date in question and saw her husband across the street in front of a bar named Riley's, talking with Roosevelt Price and Gregory Griffin. Her husband came home about 1:30 a.m. and she saw him then. He changed clothes and went to bed. He had been drinking. During that time there were no weapons in the home and she had never seen her husband with one.

The defendant, testifying on his own behalf, stated that he had never owned a handgun. He spent most of June 29 with two friends, Greg Griffin and Roosevelt Price, driving around, drinking and talking. One of the places they were in was Riley's. He left there at about 10:45 p.m. to go to another tavern at 87th and Commercial. He didn't know anyone there and drank only part of a beer. As he left, he saw Norma and her girlfriend. This was about 11:15 p.m. or 11:20 p.m. Norma asked him for a ride and he drove the two girls to their homes. He dropped Norma at her mother's house. There were two guys in a four-door black car across the street. One of them called to her and she got in the car. One man called the other "Joe." The defendant stated that he then went back to Riley's bar, arriving at 1:15 a.m. Price and Griffin were there. He then changed his mind and testified that he got back to the bar at 12:30 a.m. Then he said he did not know when he got back to Riley's but did know that he arrived home at about 1:30. He denied that he raped or committed any deviate sexual acts on Norma. He also denied taking her to the forest preserve or ever having been in the forest preserve. While the defendant on direct examination testified that after dropping Norma off he did not do anything else before going back to Riley's, on cross-examination he stated that after he dropped her off he drove around by himself for about one hour.

Roosevelt Price testifying for the defendant stated that he spent most of the day with the defendant. In the evening they went to Riley's with Greg Griffin at about 10 p.m. The defendant left with his cousin at about 10:30; the defendant returned about 20 minutes later. The defendant left again a short time later. Before he left he asked Price if he wanted to go to the Salt and Pepper which was a lounge on 87th and Commercial. Price said no and the defendant left. The defendant returned no more than one-half hour later, about 11 or 11:30. Price remained there for 20 to 30 minutes after that and then went home, arriving home at 12:35. The defendant was still at Riley's when Price left. At one point Price testified he left Riley's before midnight, at another he stated he left at 12:20. He repeated that he was not with the defendant after 12:20.

In rebuttal, Chicago police investigators Dennis McGuire and Edmund Lerancz stated that they arrested and questioned the defendant but that he did not mention a black car or Norma's getting into the car, or that one of the men called the other "Joe" or that he drove around for over an hour alone that evening, or that his wife was there when he arrived home, or that he saw anyone at 1:30 a.m. He did deny having sexual relations with Norma. He told the officers he picked up Norma between 10:30 and 11 p.m. (the defendant had testified that he told the officers it was 11:20 when he picked the girls up).

Defense counsel in final argument suggested that Norma's story was

unbelievable and that she had told this story because she was in trouble at home. In response, the prosecutor argued:

> "Now, I believe that she was trying hard to tell you the truth and she was serious about what happened to her. And she was consistent in the past.
>
> You remember during the course of the trial when Defense Attorney asked her a question, then start [*sic*] paging through the preliminary hearing transcript. Paging, paging, paging, paging, trying to look for some impeachment, some variance. Thirty, forty pages in there.
>
> MR. HIBBLER: Objection, Judge.
>
> THE COURT: Sustained.
>
> MR. BOHARIC: Trying to look for some— That's—
>
> MR. HIBBLER: Objection.
>
> MR. BOHARIC: She testified in a preliminary hearing. There is nothing that is any different.
>
> MR. HIBBLER: Objection.
>
> MR. BOHARIC: Judge, —
>
> THE COURT: All right. You may continue. Go ahead.
>
> MR. BOHARIC: He couldn't find anything and he is a good lawyer. He could not find anything in the police reports,—
>
> MR. HIBBLER: Objection, Judge.
>
> MR. BOHARIC: — in the preliminary hearing and all the times that she spoke to different individuals to bring to you to show that there was any inconsistencies at all.
>
> MR. HIBBLER: Judge, I have an objection.
>
> THE COURT: The Jury heard the evidence.
>
> MR. HIBBLER: Judge, may we have a side bar?
>
> THE COURT: You may proceed.
>
> MR. BOHARIC: Now, she has been saying the same thing from day one. Now, —
>
> MR. HIBBLER: Judge, my objection—please, the State's Attorney knows that's not true.
>
> MR. BOHARIC: He asked you to disregard all the consistencies in the testimony. He asks you to disregard that. But I tell you this, but if you are to think that the true verdict in this case is not guilty, then you must accept the proposition that this young seventeen-year-old girl absolutely framed this man right here. Absolutely framed him for no reason at all. Said 'This is the man.' "

After the jury retired the defendant moved for a mistrial because of the above statements. The prosecutor argued that the remarks were proper because:

> "Now, also, Mr. Hibbler, during the course of this trial took

approximately ten minutes during one point and made a big fuss going through about thirty or forty pages one by one. I think the record should reflect this. Through the preliminary hearing first, asked her 'Did she testify at a preliminary hearing.' Then made a big deal out of going through all of her testimony. Now, the Jury saw that. And he sat down. He sat down for another five minutes. He first made a big issue out of it right in front of the Jury right at the stand. Right in front of it. As indicating the idea that there is something wrong with her.

Then after going through the entire thirty pages then he took out the police reports and he is leafing through those during that period of time and obviously couldn't find anything and there isn't anything to impeach her with."

The court denied the motion, ruling that the remarks were proper. Defendant has never contended, at trial or on appeal, that his counsel did not engage in the activities described by the prosecutor. Indeed, in post-trial proceedings defense counsel stated "as to my reading through reports and checking over preliminary hearing transcripts, I think [the prosecutor's argument] goes beyond those inferences that can be drawn that my only purpose in looking at those documents was to find impeachment."

■■ It is well established in Illinois that it is prejudicial error for the prosecutor to tell the jury that defense counsel has the police reports, preliminary hearing transcript and grand jury transcript and then comment that the lack of impeachment from those documents proved that the statements were corroborative of a witness' testimony since by these actions the prosecutor usurps the sole discretion vested in the defense to determine the impeachment value of the materials in question. *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118; also *People v. Lowe* (1967), 84 Ill. App. 2d 435, 228 N.E.2d 563; *People v. Beard* (1966), 67 Ill. App. 2d 83, 214 N.E.2d 577.

■■ It is equally clear that prior consistent statements of a witness may not be used to buttress that witness' testimony unless it be a means of rebutting a defense charge of recent fabrication. Such an argument cannot be justified where the defense argument is, as here, that the story was fabricated on the night of the offense, since then the alleged consistent statements were all made after the alleged motive to falsify arose.

■■ The argument of the prosecutor in this cause had the clear effect of informing the jury that the witness had made prior consistent statements. Yet there was no claim by the defense of recent fabrication which would have permitted the introduction of such evidence. The prosecutor's comments also infringed on the discretion granted to the defense to

determine the impeachment value of the prior statements. The State contends that the comments were necessary to rebut the inference raised by defense counsel's actions, that there was impeaching material in the prior statements. We do not find reasonable the contention that an apparently fruitless search for impeaching material would create an inference that such material existed. Accordingly we find that the prosecutor's comments constituted error.

But although we conclude that the prosecutor's arguments went beyond the bounds of fair inference, we find no reversible error because the statements did not prejudice the defendant's right to a fair trial. Because of defense counsel's questioning, the jury was already made aware that Norma had made similar statements to the police and at a prior hearing. They witnessed the defense counsel asking Norma if she remembered testifying, they witnessed him paging through documents and they witnessed him abandoning the subject. The jury could draw its own conclusion from this without any assistance from the prosecutor and probably did. In light of the fact that the prosecutor added little or nothing to what the jury itself observed and that the evidence against the defendant was strong, particularly in light of the many inconsistencies and contradictions in the defendant's account, and that the testimony of his own alibi witnesses contradicted him, we do not believe that the prosecutor's remarks constituted a major factor in the defendant's conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Singletary* (1979), 73 Ill. App. 3d 239, 391 N.E.2d 440), "that the verdict would have been different had the improper closing argument not been made." *People v. Trice* (1970), 127 Ill. App. 2d 310, 319, 262 N.E.2d 276, 281; *People v. Singletary* (1979), 73 Ill. App. 3d 239, 391 N.E.2d 440.

Accordingly the conviction and judgment appealed from are affirmed.

Affirmed.

JIGANTI, P. J., and LINN, J., concur.