THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE MORROW *et al.*, Defendants-Appellants.

First District (2nd Division)    Nos. 80-2636, 80-2637 cons.

Opinion filed March 9, 1982.—Rehearing denied March 31, 1982.

996

Philip Krasny, of Chicago, for appellant Willie Morrow.

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellant Maurice Jones.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Ruth Stern Geis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:
Defendants Willie Morrow and Maurice Jones were charged with rape, aggravated kidnapping, unlawful restraint and armed violence. Following a jury trial, both defendants were convicted of rape and acquitted of the other charges. Defendant Morrow was sentenced to 15 years in the Illinois Department of Corrections; defendant Jones received a 10-year sentence. Both defendants appeal. Defendant Morrow makes five assignments of error, contending that (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court improperly admitted evidence of a witness' prior consistent statement; (3) the prosecutor made an inflammatory and prejudicial remark in closing argument; (4) evidence seized in a warrantless search of defendant's garage should have been suppressed; and (5) his warrantless arrest was illegal. Defendant Jones raises only one point on appeal. He contends that he was denied the effective assistance of counsel at trial.

Defendants called no witnesses at trial. The principal issue for the jury was whether the two complainants consented to the acts charged. No issue was raised as to the identity of the two defendants. The complainants were Jacqueline Plump and Juanita Bell, age 18 and 19 respectively. The two women testified that at about 11 p.m. on November 3, 1979, they went to the New Here's Lounge at 79th and Racine in Chicago, where they met three friends. According to their testimony, the complainants each had one drink while at the lounge. The two women and their three friends left the lounge at about 3 a.m. and waited outside for a bus. At this time, the two defendants approached the group and began talking with the two women. Defendant Morrow introduced himself as "Eddie" and defendant Jones introduced himself as "Maurice." The complainants told defendants their names. The conversation lasted approximately 15 minutes. During this 15-minute period, an eastbound 79th Street bus came by and the complainants' three friends boarded it. When the complainants saw a westbound 79th Street bus approaching at a distance, they crossed Racine

Avenue to get to the opposite corner where the bus would stop. While the women were crossing the street, defendants followed them and defendant Morrow pulled out a gun and directed the two women to get into a black car parked at the curb. Plump did not see the gun but testified that defendant Jones pushed her in the direction of the car. The women entered the vehicle. Bell sat in the back seat with defendant Jones and Plump sat in the front seat with defendant Morrow. Morrow drove the car for about 10 minutes and parked in an alley.

Once in the alley, defendant Morrow again displayed the pistol and demanded that both women disrobe. Defendant Jones, who was drinking from two bottles of liquor, advised the women that Morrow was "crazy" and would carry out his threat to kill them and put them in a garbage can if they didn't comply. Plump then opened her blouse, removed her pants, and engaged in intercourse with defendant Morrow in the front seat. After this act, Morrow left the car and opened the overhead door of a nearby garage. He backed the car into the garage and closed the overhead door. When he returned to the car, Morrow again displayed the pistol and ordered the women to disrobe. He then engaged in a second act of intercourse with Plump. At the same time, defendant Jones had intercourse with Bell in the back seat. After these acts, defendant Jones ordered the women to switch places. The two women climbed over the seat and engaged in two more acts of intercourse, Bell with Morrow and Plump with Jones.

After these acts, when the two women asked to be let go, the defendants offered to drive them home. The complainants declined the offer and said they would walk home (a considerable distance), but they accepted defendants' offer to drive them to a nearby bus stop. The complainants took a bus to Jacqueline Plump's home and arrived at about 7 a.m. Mrs. Plump was up and waiting for Jacqueline to return. The complainants told her they had been raped. Mrs. Plump called the police. The women were taken to a hospital where a doctor reported the presence of sperm in the vaginas and noted the absence of vaginal lacerations. Mrs. Plump testified that the complainants were crying and disheveled when they arrived at her home, but their clothes were not torn. Jacqueline Plump testified that she wet her pants while walking home from the bus stop and she vomited after reporting the rape to her mother.

While the complainants were at the hospital, they were interviewed by Investigator Charles Grunhard. The women gave Grunhard descriptions of the garage, the car and the two men. The complainants then left the hospital with Grunhard and his partner, Thomas Bennett, in an unmarked police car. The officers drove the women to the New Here's Lounge and began retracing the route taken by defendants' car. Near the intersection of 93rd and Elizabeth, Juanita Bell recognized an alley. The police drove

down the alley until Miss Bell recognized the garage where the defendants' car had been parked. She recognized the garage because the service door (the small entry door on the side of the garage) was off the hinges. It was now about 11 a.m. on the morning of November 4, a Sunday.

The yard in which the garage was located had a fence at the rear lot line. Investigator Bennett went through the gate in the fence (the evidence does not establish whether the gate was open or closed) and into the yard. He then looked into the garage through the open service door. The service door was on the side of the garage, facing a sidewalk that led from the rear gate to a house near the front of the lot. Bennett saw a car matching the description given by the complainants: a large black two-door car with the driver's window replaced by a plastic sheet and with no license plates but a "license applied for" sticker on the windshield. Bennett called to Grunhard, and the two police officers entered the garage. The officers opened the car's door and found a baseball bat next to the driver's seat and a .25-caliber bullet on the floor by the driver's seat. Two empty liquor bottles were on the back seat. The officers also noted that the "license applied for" sticker bore the name "Willie Morrow."

The officers returned to their police car, called for additional units, and drove around the block to the front of the lot. The address of the house on the lot was 9212 South Elizabeth. As the officers got out of the police car and approached the house, a boy (later identified as defendant Morrow's 15-year-old brother, Mark) was coming down the front steps. Grunhard called out to the boy and the boy began to return to the house. The officers caught up with the boy on the front porch and there ensued a very brief and confusing conversation in which Bennett mentioned "Willie" and asked the boy about the car in the garage and whether anyone was home. The boy said, "My sister is here," and went into the house, closing the door behind him. The officers, looking through a window, saw the boy run to the rear of the house. At the same time, a young woman (later identified as defendant Morrow's sister, Vickie Morrow) came to the door. Without speaking to Vickie, the officers entered the house and ran to catch up with the boy, who was going upstairs. The officers followed the boy to an upstairs bedroom. In that room, one individual (later identified as defendant Morrow's 16-year-old brother, Fred) was lying in bed watching television; the other individual, who matched the description given Grunhard by the two complainants, was asleep in his bed. The police woke the sleeping man, identified in court as defendant Morrow, and asked if he was "Willie" and if the car in the garage was his. Defendant Morrow answered "yes" to both questions and was arrested.

The police allowed Morrow to dress and then took him to the garage, where they advised him of his constitutional rights. Defendant Morrow at

first denied being with women the night before and said he had been out drinking with a friend, Derrick Sullivan. Defendant Morrow was then taken to the police station, where he was advised that Sullivan did not back up his alibi. Morrow then admitted that he was out with two women and had intercourse with them. He also gave the police defendant Jones' name.

## I

■■ Defendant Morrow contends that he was not proved guilty beyond a reasonable doubt. The State offered testimony from the two complainants, from Plump's mother, from Investigator Grunhard and from Officer Brown, who responded to Mrs. Plump's phone call reporting the rapes. Defendants called no witnesses and stipulated to the complainants' identification testimony. Morrow and Jones both relied on the defense of consent. Defendants assert that the two women made no "prompt complaint" of the attack. In fact, the victims did announce that they had been raped, but they waited until they reached Plump's home and did not seek assistance from the bus driver or passengers. Whether this delay in making a "prompt complaint" diminishes the probative value of the accusation is a question for the jury. There is no fixed time limit within which a prompt complaint must be made. (See *People v. Secret* (1978), 72 Ill. 2d 371, 377, 381 N.E.2d 285.) Defendants also stress the lack of physical evidence of force. The lack of physical evidence corroborating a claim of forcible rape is not fatal to the State's case. The testimony of the complainant, if clear and convincing, is sufficient to support a conviction. (See *People v. Secret* (1978), 72 Ill. 2d 371, 376.) In the case at bar, the complainants testified unequivocally regarding the use of force. Their credibility was an issue for the trier of fact. The reviewing court will not substitute its judgment for that of the jury which heard the evidence and saw the demeanor of the witnesses. See *People v. Sherman* (1980), 87 Ill. App. 3d 937, 940, 407 N.E.2d 486.

Defendant Morrow also contends that the trial court erred in admitting evidence of a prior consistent statement of Juanita Bell. On direct examination, Bell related that defendant Jones had threatened to rob her, but defendant Morrow advised against it. When asked if Jones robbed either Plump or herself, Bell said, "No." On cross-examination by defendant Morrow's attorney, Bell gave a different answer:

> "Q. Now, after the acts of sexual intercourse had been completed and there was a discussion regarding a robbery, nobody robbed anybody, did they? Nobody took anything, did they?
>
> A. Well, I did get one of my necklaces taken away from me."

Defendant Morrow's attorney then attempted to impeach Bell.

> "Q. Well, did you tell the first officer that was on the scene,

Officer Brown, who came to your [*sic*] house, did you tell him that jewelry or a necklace had been taken?

A. No, but I—

Q. Ma'am, did you at any time, when you testified before his Honor Judge Pompey [the preliminary hearing judge], on November 20, 1979, three weeks after this case, did you even tell Judge Pompey that a necklace was taken from you?

\* \* \*

A. No."

On redirect examination, the prosecutor asked Bell if she told Investigator Grunhard that a necklace had been taken. She replied, "Yes." On direct examination, Grunhard was allowed, over defense objection, to confirm Bell's statement.

Defendant Morrow argues that evidence of Bell's prior consistent statement (that a necklace had in fact been taken) was incompetent. Defendant cites *Eizerman v. Behn* (1956), 9 Ill. App. 2d 263, 132 N.E.2d 788, for the proposition that evidence of out-of-court statements corroborative of a witness' in-court testimony is inadmissible. (9 Ill. App. 2d 263, 283-84.) The State acknowledges the general rule set forth in *Eizerman* but argues that there is an exception to that rule: evidence of out-of-court statements consistent with a witness' testimony is admissible to corroborate the witness' testimony when the witness is charged with fabricating his testimony, as long as the prior statement was made before the motive to falsify arose. (See *Stolp v. Blair* (1873), 68 Ill. 541, 544.) The State argues that the defense has impliedly charged the complainants with falsifying their testimony as to coercion.

■■ Assuming, *arguendo*, that the defense sought to prove that Bell's testimony was a recent fabrication, the exception advanced by the State is nevertheless inapplicable. The exception applies only to an out-of-court statement made *before* the witness acquired a motive to falsify. A statement made *after* the witness had a motive to falsify is not within the exception. (See *People v. Rosario* (1979), 74 Ill. App. 3d 607, 612, 393 N.E.2d 543.) If, in the case at bar, the women consented to the acts complained of (as the defense argues), then the motive to falsify arose as soon as Bell and Plump told Mrs. Plump they had been raped. If Bell was indeed lying at that point, she thereafter had a motive to embellish her story with descriptions of robbery and other coercive events. Bell's conversation with Grunhard occurred after the alleged motive to falsify arose. Evidence of her statement to Grunhard was therefore inadmissible.

■■ Two references to Bell's prior statement about the alleged robbery were admitted into evidence. Grunhard related to conversation on direct examination and Bell told of it on redirect examination. We find that Bell's testimony was admissible, although not for the reason advanced by the

State. The defense did not impeach Bell with a prior inconsistent statement. Rather, the defense attempted to impeach her with her prior silence: the fact that she did not tell Officer Brown or Judge Pompey about the alleged robbery. When a witness is impeached by a prior inconsistent statement, the witness is entitled to an opportunity to explain or qualify the statement and show why it was made. (*People v. Gammons* (1970), 130 Ill. App. 2d 120, 123, 264 N.E.2d 866.) It follows that if a witness is impeached by prior silence, she should be given an opportunity to explain her silence. One such explanation could be testimony to the effect that, "I said nothing to Brown but I did report it to Grunhard." On this basis, Bell's statement on redirect was admissible.

■■ Grunhard's testimony regarding the conversation remains inadmissible. Nevertheless, we cannot see how defendant Morrow was prejudiced by the testimony. Defendants were not charged with robbery. In impeaching Bell, the defense sought to point out inconsistency in her testimony and thereby impugn the reliability of that testimony. That inconsistency was demonstrated to the jury in a glaring and direct manner by the discrepancy between Bell's testimony on direct and cross-examination. The fact that Grunhard agreed with one of the accounts (Bell's testimony on cross-examination) does not relieve the inconsistency. It does not appear that this testimony was a major factor in defendant Morrow's conviction. We hold that the error was not reversible. See *People v. Rosario* (1979), 74 Ill. App. 3d 607, 613.

Defendant Morrow also contends that the trial court erred in refusing to declare a mistrial following an allegedly inflammatory and prejudicial remark in the State's closing argument. Defendant Jones' attorney had argued in closing, "If you are going to rape someone, you don't take them to where you live." In rebuttal, the prosecutor responded, "Everybody who has been in criminal law long enough knows that it is not at all unusual or uncommon to take a victim to the home turf. Look at the Gacy case for that matter." Both defense attorneys immediately objected. The trial court stated, "Gentlemen, pursue some different argument. We are not dealing with the Gacy matter here, Counsel. * * * Continue your argument on a different cant."

■■ The mere mention of the name of an infamous mass murderer does not necessarily amount to irreparable prejudice. Here, the prosecutor did not compare defendants with Gacy and mentioned the case only to make a point regarding criminal behavior. The trial court quickly admonished the prosecutor and indicated in the presence of the jury that the Gacy matter was irrelevant. (*Cf. People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 325, 379 N.E.2d 847 (prosecutor's reference to Richard Speck was not reversible error where defendant was not compared with Speck and where defense objection was sustained and jury instructed to disregard

the remark).) We find that the remark in question was inappropriate but not reversible error.

Defendant Morrow contends that the warrantless search of the garage and his car was unconstitutional and that the bullet seized in that search should not have been admitted into evidence. We find that two distinct searches occurred, and we will treat them separately. As noted above, the garage in question was at the rear of the lot and faced the alley. The overhead door was closed but the service door was either open or missing. In order to look through the open doorway the police had to enter the fenced back yard. We believe that the first search occurred when Investigator Bennett entered the yard and looked into the garage. "A search implies a prying into hidden places for that which is concealed, and it is not a search to observe that which is open to view." (*People v. Marvin* (1934), 358 Ill. 426, 428, 193 N.E. 202.) The interior of the garage was not open to view from any public place. Bennett had to enter the fenced yard to see defendant Morrow's car. The fact that a trespass was involved, however, does not of itself make the officers' actions unreasonable (see *City of Decatur v. Kushmer* (1969), 43 Ill. 2d 334, 338-39, 253 N.E.2d 425), nor does the fact that the curtilage was breached create a *per se* violation of the fourth amendment. (See *People v. Lashmett* (1979), 71 Ill. App. 3d 429, 436, 389 N.E.2d 888, *cert. denied* (1980), 444 U.S. 1081, 62 L. Ed. 2d 765, 100 S. Ct. 1034, citing *United States v. Fluker* (9th Cir. 1976), 543 F.2d 709, 716, and *Wattenburg v. United States* (9th Cir. 1968), 388 F.2d 853, 857.) The appropriate test is whether the defendant had a reasonable expectation of privacy in the contents of the garage. See *Katz v. United States* (1967), 389 U.S. 347, 351-52, 19 L. Ed. 2d 576, 581-82, 88 S. Ct. 507, 511; see also *Wattenburg v. United States* (9th Cir. 1968), 388 F.2d 853, 857; *People v. Pakula* (1980), 89 Ill. App. 3d 789, 793, 411 N.E.2d 1385.

The circumstances of the instant case compel us to focus on the "reasonable" element of the "reasonable expectation of privacy." The enforceability of an individual's expectation of privacy has always been tempered by compelling public necessity. (See *Michigan v. Tyler* (1978), 436 U.S. 499, 509, 56 L. Ed. 2d 486, 498, 98 S. Ct. 1942, 1949-50 (listing exigent circumstances justifying a warrantless entry).) While it is true that the case at bar does not demonstrate the sort of exigency presented by hot pursuit (see *Warden v. Hayden* (1967), 387 U.S. 294, 298-99, 18 L. Ed. 2d 782, 787, 87 S. Ct. 1642, 1646), or a burning building (see *Michigan v. Tyler* (1978), 436 U.S. 499, 509, 56 L. Ed. 2d 486, 498, 98 S. Ct. 1942, 1949-50), we nevertheless believe that the overall situation must be taken into account. The police here, although not in hot pursuit, were certainly engaged in a "warm" pursuit. Plump and Bell, released by their abductors only a few hours earlier, had led the officers to what the victims believed

was the scene of the crime. If the two women were correct, the officers had an important new lead to follow. If the women were proved wrong in their identification of the garage, the police needed to know that fact as soon as possible in order to continue their investigation without unnecessary delay. Under the circumstances, the most reasonable course of action was for one of the officers to venture about 20 feet into the yard and look through the open door.

If an intrusion into an individual's zone of privacy is justified by exigency, the "moderate" exigency of the instant case justified only the most petty intrusion. The entry into the yard through an unlocked (and possibly unclosed) gate was of such a character. We must stress the triviality of the first search: the service door was already open (a condition visible from the alley), the officers touched nothing (except possibly the gate), there was no intrusion on a dwelling and the search lasted only a few seconds. We cannot find that defendant Morrow's expectation of privacy could reasonably bar such a search.

■■ We note that the concept of balancing an individual's rights against the exigencies of the situation is not novel. *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, and the appellate court cases following it have elucidated the factors that establish exigency and excuse the requirement of a warrant for the arrest of a suspect in his home. These "exigency factors" need only be satisfied on balance. (*People v. Thompson* (1981), 93 Ill. App. 3d 995, 1005, 418 N.E.2d 112.) Implicit in this schema is the premise that great necessity may justify a tumultuous warrantless entry, and "moderate exigency" may justify only a limited or peaceable intrusion. (Compare *People v. Simon* (1981), 101 Ill. App. 3d 89, 427 N.E.2d 843 (suspects were armed and dangerous; warrantless entry with a battering ram was reasonable under the circumstances), with *People v. Davis* (1981), 97 Ill. App. 3d 299, 422 N.E.2d 989 (no evidence that suspects were armed; peaceable warrantless residential arrest was justified).) We hold that the limited intrusion of the first search was justifiable and defendant Morrow's constitutional rights were not violated by that search.

■■ The same cannot be said for the second search. Immediately after viewing Morrow's car in the garage, Investigator Bennett called to Investigator Grunhard and the two officers searched the car, discovering a bullet on the floor of the car and seeing the name "Willie Morrow" on a "license-applied-for" sticker. Neither exigency nor any other exception to the warrant requirement justifies this search. The "automobile exception" to the warrant requirement does not apply when a car is neither on the highway nor movable. (See *People v. Rinaldo* (1980), 80 Ill. App. 3d 433, 436, 399 N.E.2d 1027.) The fact that the car was garaged confirms the owner's expectation of privacy with respect to its contents even though, as we have found above, the owner lacked a reasonable expectation of

privacy with respect to the presence of the car in the garage, since the car was visible through an open door. The trial court therefore erred in refusing to suppress evidence of the bullet.

■■ Defendant Morrow also argues that his warrantless arrest was illegal. When the police went from the garage to the front of the house, they had probable cause to arrest defendant Morrow. From the complainants, the police knew Morrow's description and the fact that he might be armed. From the first search, the police had reason to believe that the suspect was in the house. From the second search, which we have found illegal, the police knew Morrow's name.

We noted above that *People v. Abney* and its progeny have set forth the factors that justify a warrantless residential arrest. The opinion in *People v. Davis* (1981), 93 Ill. App. 3d 217, 221, 416 N.E.2d 1197, contains a concise list of these factors:

> "(1) whether a grave offense is involved, particularly one that is a crime of violence; (2) the suspect is reasonably believed to be armed; (3) there exists not merely the minimum of probable cause that is required when a warrant has been issued but beyond that a clear showing of probable cause; (4) strong reason exists to believe the suspect is in the premises being entered; (5) there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry is forceable or peaceful; and (7) the time of entry, day or night."

Reviewing the facts of the instant case, we find that the exigency test has been met. Acting on information learned moments earlier, the police were on the trail of a rapist believed to be armed. As the officers approached the house, Mark Morrow, who recognized them as policemen, turned and ran back into the house. During the brief exchange on the porch, the officers referred to the car in the garage, so they could reasonably have inferred that the boy was running back into the home to warn the owner of the car. We believe that these facts gave rise to a strong inference of probable cause, and we find that such probable cause existed without resort to information learned in the second search. The police did not need to see the bullet in order to believe that the suspect was armed, and the police did not need to know the name "Willie Morrow" in order to arrest defendant Morrow, who matched the description given by the two women. We conclude that defendant Morrow's arrest was legal, and the trial court did not err in refusing to suppress evidence of his post-arrest statements and post-arrest identification.

■■ We have found the evidence more than sufficient to support a finding of guilt beyond a reasonable doubt. The identification of the defendants was not in issue. Defendant Morrow admitted in his post-arrest statement to having intercourse with two women. The complainants were graphic

and consistent in their testimony regarding coercion. Their testimony was buttressed by evidence of a prompt complaint. Although we have found that the trial court erred in admitting evidence of the bullet found in the car, this error does not require reversal. An error may be found harmless beyond a reasonable doubt if the error is inconsequential, or if the error is harmless when balanced against the strength of the State's evidence. (*People v. Glover-El* (1981), 102 Ill. App. 3d 535, 541.) The bullet was not inconsequential but, given the totality of the State's evidence, we conclude that its admission was harmless error. Defendant Morrow's conviction is therefore affirmed.

## II

Defendant Jones makes only one claim on appeal. He contends that his privately retained trial counsel was incompetent, and he cites four instances of alleged incompetence: (1) the attorney moved to sever Jones' and Morrow's trials but never argued or pursued the motion; (2) the attorney did not move to suppress defendant Jones' post-arrest statement (an alibi account); (3) the attorney did not ask for a limiting admonition when evidence of defendant Morrow's attempted escape from custody was introduced; (4) the attorney did not object to alleged improper remarks in the State's closing argument.

■■ Defendant Jones' attorney's failure to pursue the motion to sever cannot amount to incompetence if the motion would have been unavailing, since there is no incompetence in failing to do a futile act. (See *People v. Dudley* (1970), 46 Ill. 2d 305, 310, 263 N.E.2d 1.) The motion to sever was a futile act. The general rule regarding severance is set out in *People v. Wilson* (1963), 29 Ill. 2d 82, 193 N.E.2d 449, *cert. denied* (1964), 377 U.S. 955, 12 L. Ed. 2d 499, 84 S. Ct. 1634. Persons indicted jointly should be tried together; the granting of a motion for severance is within the discretion of the trial court and the primary issue on such a motion is whether the defenses are so antagonistic that a fair trial can be assured only by a severance. (29 Ill. 2d 82, 91.) In the instant case, the defendants offered identical defenses: consent. Defendant Jones asserts that the evidence was strong as against Morrow but weak as against Jones. This is not so. Although Morrow carried the gun and made the original threat, Jones was more than a bystander. If the acts complained of were procured by force, both defendants benefited from the coercion. There is no basis in the evidence for finding that the women were forced into sex with Morrow but consented to the same acts with Jones. Since the motion to sever was without a basis, the failure to argue the motion was not incompetence.

■■ Defendant Jones argues that his trial attorney should have moved to suppress his post-arrest statement. The statement, testified to by Investi-

gator Grunhard, was a claim of alibi made when Jones was arrested. Defendant Jones has not clearly indicated what grounds existed for suppression of the statement. He has not contended that his arrest was illegal. Defendant Jones apparently believes that his co-defendant Morrow's arrest was illegal and police gained knowledge of Jones only through Morrow's allegedly inadmissible post-arrest statement. *Rakas v. Illinois* (1978), 439 U.S. 128, 133-34, 58 L. Ed. 2d 387, 394, 99 S. Ct. 421, 425, teaches that fourth amendment rights are personal and may not be asserted by one whose rights have not have been violated. This concept has sometimes been conceived of as an issue of "standing," but the court in *Rakas* indicates that the problem is better viewed as a question of whether the movant's constitutional rights have been infringed. (439 U.S. 128, 139, 58 L. Ed. 2d 387, 398, 99 S. Ct. 421, 428.) Here, there has been no showing of a fourth amendment violation as to Jones. A motion to suppress would have been futile, and there was no incompetence in failing to so move.

■■ When Grunhard testified concerning defendant Morrow's attempted escape from custody, defendant Jones' attorney did not ask for an in-trial admonition limiting the "flight" evidence to defendant Morrow. Grunhard did not mention defendant Jones in connection with the episode. We see no basis for assuming that the jury would infer Jones' guilt from Morrow's flight. Jones' attorney's failure to ask for a limiting instruction could well have been based on a tactical decision to refrain from drawing attention to the flight. Matters going to judgment and tactics are insufficient to show incompetence of counsel. (*People v. Newell* (1971), 48 Ill. 2d 382, 387, 268 N.E.2d 17.) We also note that Grunhard's account was brief and undetailed and the State did not refer to the matter in closing argument.

■■ The prosecutor twice referred in closing argument to the "uncontradicted" evidence and said, after listing the State's witnesses, "Those were the only people that testified in this trial." Defendant Jones argues that these remarks were impermissible references to the defendants' failure to testify. Under the rule set forth in *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, 284 N.E.2d 283, we find that these comments were permissible as accurate summation of the evidence. Defendant Jones supports his claim by citing *People v. Wollenberg* (1967), 37 Ill. 2d 480, 488, 229 N.E.2d 490, and *People v. Escobar* (1979), 77 Ill. App. 3d 169, 178, 395 N.E.2d 1028. Those cases are distinguishable. In the case at bar, unlike *Wollenberg* and *Escobar*, no defense witnesses testified, so the State's evidence was uncontradicted. Defendant Jones notes other remarks to which his attorney did not object. It is not necessary to deal with each remark; viewed singly or collectively, the comments are not prejudicial. We note further that in one such instance, defendant Morrow's attorney objected, so no purpose would have been served by an objection from

Jones' attorney. In sum, we find that defendant Jones has made no colorable showing of his trial attorney's incompetence under any of the prevailing standards. Since this is the only point advanced on appeal, his conviction is affirmed.

Affirmed.

DOWNING and HARTMAN, JJ., concur.