THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KENNETH L. PETERSEN, Defendant-Appellant.

Fourth District   No. 17683

Opinion filed November 30, 1982.

Roger W. Thompson, of Lincoln, for appellant.

Robert J. Barry, State's Attorney, of Lincoln (Robert J. Biderman and James K. Horstman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Following a jury trial, the defendant was found guilty of the offenses of reckless homicide and leaving the scene of an accident involving death. Judgment was entered only on the reckless homicide count, and defendant was sentenced to six months' imprisonment in the Logan County jail, placed on 30 months' probation, and ordered to pay court costs in the amount of $445.60.

On appeal, the defendant contends that the police illegally entered a portion of the premises where he resided in search of a hit-and-run vehicle, that his warrantless arrest in his home was unconstitutional and that his automobile was illegally seized by police. Therefore, defendant argues that statements which he made while in custody and the results of an intoxilyzer test administered after his arrest, as well as evidence removed from his automobile, should have been suppressed. Defendant further asserts that since the evidence which led police to believe that his automobile was the car involved in a hit-and-run accident was obtained as a result of a violation of his fourth amendment rights, there was insufficient probable cause for the issuance of a warrant for the performance of skid tests with his automobile, and that, therefore, the results of such tests should also have been suppressed. Defendant finally contends that a gruesome color slide of the victim's body as found at the accident scene should not have been admitted into evidence, and that he was not proved guilty of reckless homicide beyond a reasonable doubt.

At approximately 10:45 p.m. on the evening of August 10, 1981, Trooper Daniel Fruge of the Illinois State Police observed a male body lying on the left side of Ottawa Street in Lincoln. Fruge stopped his vehicle and checked the man's neck and wrists for a pulse, but could not find one. The man was subsequently pronounced dead at the scene and was identified as Ralph E. Lawrence. He had apparently been struck with great force by a motor vehicle, for his body was badly mangled. Fruge immediately notified the Lincoln Police Department, as well as Illinois State Police headquarters, of his discovery. Sergeant William Ritter, Fruge's shift supervisor, was the first to respond to Fruge's call for assistance. He conducted an on-the-scene interview with three witnesses who had seen a gold Monte Carlo with a shattered windshield and heavy front-end damage driving away from the scene of Lawrence's death. In the meantime, the Lincoln police department dispatcher received an anonymous telephone tip that the suspected hit-and-run vehicle was at defendant's residence. This information, along with that obtained during Ritter's interview with the three witnesses at the scene, was then broadcast to police cars which

were patrolling the city.

Officer Duff Starr and Sergeant Larry Hill, both of the Lincoln police department, heard the dispatch relating to the suspected hit-and-run vehicle and arranged to meet each other at defendant's residence, which was a duplex. Sergeant Hill was the first to arrive at defendant's home. He drove his squad car to the back of the duplex and positioned it so that he could see the front end of a heavily damaged automobile parked parallel to a set of railroad tracks which ran alongside the duplex. The car's windshield was partially shattered, the right front grill area was badly smashed, and what appeared to be blood was splattered over the rear of the car. The area surrounding the car was fairly well lit, but Hill nevertheless shined his flashlight on the car in order to view it. Although the suspect vehicle was registered in the name of Lester K. Petersen (defendant's father), Hill was able to associate the car with defendant, whom he had previously seen driving it. Officer Starr stated that when he arrived at defendant's home, he had to walk to the back of the duplex in order to fully observe the damage to the Monte Carlo, although the rear three quarters of the car was visible from the street.

After viewing the damaged vehicle, Starr and Hill went to the rear door of defendant's residence. The door apparently consisted of clear glass, and they could see defendant inside. Sergeant Hill knocked on the door and defendant opened it, stepped back, and allowed Hill to enter. Hill asked the defendant if he had had an accident, to which defendant responded in the affirmative. Hill then took two or three steps into the residence, and advised defendant that he would have to go the Logan County Public Safety Complex for further investigation. Officer Starr then transported defendant to the complex and Hill remained at the defendant's residence.

Sergeant William Ritter of the Illinois State Police subsequently arrived at defendant's residence and stayed with the vehicle until Corporal Brown from the Vehicle Identification Bureau arrived. Detective Vonderahe of the Lincoln police department was also present during this time period and took some photographs of the Monte Carlo. At approximately 1 a.m. on the morning of August 11, 1981, Corporal Wellenkamp, a crime scene technician, arrived. He collected three additional pieces of evidence from the vehicle and took some additional photographs of it. He and Corporal Brown then supervised the towing of the car to an enclosed commercial garage.

■ We first consider defendant's contention that the warrantless entry of police on the premises where he resided, for the purpose of viewing the suspect vehicle, was illegal. The threshold question which

must be answered is, of course, whether the defendant had a legitimate expectation of privacy in the area where the police viewed the Monte Carlo. (See *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.) The constitutionally guaranteed right to be free from warrantless searches extends to the areas of a yard surrounding a dwelling in which the residents have a reasonable expectation that they will be free from unannounced intrusions. (See, *e.g., Wattenburg v. United States* (9th Cir. 1968), 388 F.2d 853.) One does not, however, have a legitimate expectation of privacy in areas surrounding a residence which are visible from neighboring lands (see *State v. Pontier* (1974), 95 Idaho 707, 518 P.2d 969), even if it necessary to stand on one's toes or lean around the side of a partition in order to view the area in question. (*United States v. McMillon* (D.D.C. 1972), 350 F. Supp. 593.) For this reason, a police officer may enter an unenclosed driveway to obtain a closer look at an automobile which is partially visible from the street without violating any reasonable expectation of privacy. See *United States v. Humphries* (9th Cir. 1980), 636 F.2d 1172.

At times, even one's privacy interest in a portion of a premises which is normally subject to fourth amendment protections must yield to compelling public necessity. For instance, police may make a warrantless entry of a house while in hot pursuit of an armed robber (*Warden v. Hayden* (1967), 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642), and may enter a dwelling without a warrant to prevent the imminent destruction of evidence (*Ker v. California* (1963), 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623). In this respect, a case strikingly similar to the case at bar is *People v. Morrow* (1982), 104 Ill. App. 3d 995, 433 N.E.2d 985. There, two rape victims provided police with a description of the car in which they had been abducted and identified the garage where some of the rapes took place. The rapes occurred between the hours of 3 and 7 a.m., and police, accompanied by the victims, arrived at the garage at about 11 a.m. the same morning. The yard in which the garage was located was enclosed by a fence which ran along the rear lot line. A detective entered the yard through a gate in the fence. The record did not disclose whether the gate was closed or open at the time of the detective's entry. The detective looked into the garage through an open service door which was on the side of the garage, facing a sidewalk that led from the rear gate to a house near the front of the lot, and saw an automobile which matched the description given by the victims. The detective then called to another officer and they entered the garage, opened the car door and discovered various items of evidence. The court, in rejecting the contention of one of the defendants that the detective's

entering the yard and looking through the garage door constituted an illegal search, stated that although entry upon the premises was not made in a "hot pursuit" situation, the officers were certainly engaged in "warm" pursuit. The victims had been released by their abductors only a few hours earlier, and if the garage in question was not the location where some of the rapes occurred, the police needed to know this as soon as possible in order that they could continue their investigation without unnecessary delay. Relying on the principle that a moderate exigency justifies only a petty peaceful intrusion, the court held that the detective's looking into the garage through the open door was justified under the circumstances of the case.

In the present case, as in *Morrow*, the officers' initial entry on the premises occupied by defendant was of a trivial character. The record contains no indication that the yard surrounding the duplex was fenced, the hit-and-run vehicle was not in a garage or otherwise enclosed, the police did not touch the car and there was no intrusion on a dwelling during the search. The police arrived at the premises within an hour of the victim's death and thus were certainly in "warm" pursuit of the perpetrator of the crime if not in hot pursuit. (*Cf. People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543 (commission of offense within past 90 minutes supported warrantless arrest of suspect in his home).) The need for the police to promptly determine whether the vehicle in question had been involved in the accident so that they would know whether to continue their search for the hit-and-run vehicle was quite compelling under these circumstances. Because of the visibility of a portion of defendant's vehicle from the street and the proximity of the officers' entry on the premises to the time of the victim's death, there was even greater justification for the warrantless search which led to the discovery of the suspect vehicle in the present case than in *Morrow*.

Furthermore, the evidence indicates that the Monte Carlo was parked parallel to a railroad track. There is no indication that any type of barrier separated the area where the car was parked from the track. The fact that the entire vehicle, including the damaged portion thereof, was probably visible from neighboring lands completely destroys any expectation of privacy that defendant had in the area where the automobile was parked. We therefore hold that defendant most likely had no legitimate expectation of privacy in the area where the hit-and-run vehicle was discovered, and that if such an expectation indeed existed, the trivial violation thereof which led to discovery of the hit-and-run vehicle was fully justified by exigent circumstances.

■ We now turn to the question of whether the warrantless sei-

zure of defendant's automobile was a violation of his fourth amendment rights. Generally, objects which are not inadvertently discovered by police officers may never be seized without a warrant unless the objects are contraband, are dangerous in themselves, or are found within the immediate proximity of a lawfully arrested individual. (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022.) *Coolidge* provides no solace to the defendant, however, for we are of the opinion that the discovery of the hit-and-run vehicle was inadvertent. This aspect of the instant case is virtually indistinguishable from the situation with which we were recently confronted in *People v. Smith* (1981), 101 Ill. App. 3d 772, 428 N.E.2d 641. In *Smith*, the police received an anonymous tip that an item of stolen property was at a particular location. The police proceeded to that site, found defendant in possession of the stolen property, seized the property, and arrested defendant. We held that the discovery of the stolen property was inadvertent, because the police were conducting an investigation based solely on an informant's tip and were not certain what they would find. Here, as in *Smith*, the officers were acting entirely on the basis of an anonymous phone call; they did not know for certain that they would find the hit-and-run vehicle at the premises where defendant resided. Therefore the discovery of the automobile was inadvertent, and its seizure was not violative of defendant's fourth amendment rights as delineated in *Coolidge*.

■ Moreover, the introduction of evidence obtained through an improper seizure of defendant's automobile would not have required reversal of his conviction under the circumstances of this case, for the identity of defendant was not at issue. His trial testimony clearly established that he hit someone with his car at the time and place of the victim's death. Therefore, the evidence introduced at trial that was gained as a result of the seizure of defendant's vehicle, which consisted mainly of information that "fits" were obtained between the damaged portions of the vehicle and pieces of the vehicle found at the scene of the accident and knowledge that blood and hair found on the vehicle may have been that of the victim, was purely cumulative, and was beyond a reasonable doubt immaterial to defendant's conviction. See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

■ Finally, in view of the observations made by the police officers while legitimately present on defendant's premises, their knowledge that defendant frequently drove the damaged vehicle, and defendant's admission to Sergeant Hill that he had been involved in an accident, there was clearly probable cause for issuance of a warrant for the

performance of skid tests with defendant's vehicle. Thus defendant's assertion that this warrant was issued without probable cause is meritless.

■■ Defendant's next contention is that he was illegally arrested in his home. In the absence of the valid consent of an occupant or exigent circumstances, law enforcement officials may not make a warrantless entry of a home in order to effect a routine felony arrest. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) Consent for the police to enter a premises must be voluntary under the totality of the circumstances in order to sustain the validity of a warrantless arrest in a defendant's home. Therefore, absent an exigency, an officer must necessarily seek permission before entering a dwelling to make a warrantless felony arrest if such permission is not offered. The burden is on a defendant to establish the illegality of his arrest when he intends to utilize the alleged illegality as a basis for suppression of evidence. *People v. Lane* (1982), 106 Ill. App. 3d 793, 436 N.E.2d 704.

■ In the present case, Sergeant Hill knocked on the door of defendant's residence before entering. When the defendant saw Hill, he opened the door to admit the officer and stepped back a few paces so that Hill could enter. There is no discrepancy as to this point in the testimony of Sergeant Hill and defendant, both of whom testified at the hearing on defendant's motion to suppress evidence. Although defendant did not verbalize his invitation for Hill to enter his dwelling, it is apparent that his actions were intended as an offer of permission for Hill to enter. Furthermore, defendant testified that Sergeant Hill was in uniform when he entered and that he knew why Sergeant Hill was there. Thus, defendant was fully aware of Hill's purpose and authority at the time he entered defendant's dwelling. (See *People v. Wolgemuth* (1977), 69 Ill. 2d 154, 370 N.E.2d 1067.) We must therefore conclude that the entry of Sergeant Hill to defendant's home was pursuant to consent voluntarily granted by defendant. It follows that defendant's arrest was not illegal and that the trial court did not err in admitting evidence of defendant's post-arrest statements and the results of the intoxilyzer tests administered to him.

■ The defendant further asserts that the projection to the jury of a color slide, showing the victim's body as found by police at the scene of the accident, with the intestines hanging out of the body onto the pavement, was error. Since the cause of decedent's death and decedent's identity had earlier been established, and since defendant raised no issue at trial concerning these matters, defendant ar-

gues that the projection of this slide served no useful purpose and only inflamed the passions of the jury against him.

This argument is likewise without merit. Generally, upon a plea of not guilty, the State is entitled to fully prove the crime charged, even if the defendant offers to stipulate to certain evidence. Trial judges generally have wide discretion in regard to the admission of photographs of crime victims, and may admit gruesome photographs of the victim taken at the scene of the crime which are probative of any fact in issue. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771.) Furthermore, photographs are not unnecessarily cumulative simply because there is oral testimony covering the same issue as to which the photographs are introduced as evidence. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.

The only case cited by defendant in which a photograph of a homicide victim was held inadmissible at the perpetrator's trial is *People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121. In *Garlick*, the defendant admitted to killing the victim; his sole defense was insanity. Therefore, the court held that photographs showing the extent of the victim's wounds were inadmissible and served no purpose other than to prejudice the jury against defendant. In the present case, however, the photograph of the victim as discovered at the scene of the crime was probative of the force with which decedent was struck, and thus the speed at which defendant's automobile was traveling at the time that it hit the victim. It informed the jury of the extent and nature of decedent's injuries much more accurately than the testimony of the witnesses who viewed the accident scene. Since vehicular speed at the point of impact is obviously an important (although not controlling) factor in ascertaining whether a defendant is guilty of reckless homicide, we hold that the trial court did not exceed the bounds of its discretion in allowing the projection of the slide of which defendant complains.

The defendant's final contention is that he was not proved guilty of reckless homicide beyond a reasonable doubt. The evidence discloses that the speed limit on the portion of Ottawa Street where decedent's body was found was 25 miles per hour, and that a college campus was on at least one side of the street. According to the skid tests conducted with defendant's vehicle by the Illinois State Police, defendant was traveling at approximately 36 miles per hour at the time that his car collided with Lawrence. The skid tests are subject to a one to two percent error factor, but the error, if any, accrues in favor of an accused. A fresh skid mark 71 feet in length was found at the scene of the ac-

cident. The defendant was subjected to two intoxilyzer tests more than one hour after Lawrence's death, and both tests showed that defendant had a blood alcohol content of .17%.

Trooper Stuart R. Erlenbush of the Illinois State Police began an interview with defendant at approximately 12:05 a.m. on August 11, 1981, at the Logan County Public Safety Complex. The defendant first told Erlenbush that at the time of the accident, he was driving in the vicinity of Lincoln College at a speed of 30 miles per hour, that he was keeping an eye on his speedometer, that he had his lights on, that he was driving on the right hand side of the road, and that he was not drunk. He hit something walking in his path as he drove down the street. He did not stop because he was scared and drove straight home. When he arrived at his residence, he did not at first know what to do, but he later walked back to the place where he had struck something, and in talking to a bystander learned that a man had been hit. The defendant then returned home a second time and was getting ready to call the police when Sergeant Hill knocked on the door. Erlenbush specifically asked the defendant if he had been drinking, and he replied in the negative. Since Erlenbush smelled alcohol on defendant's breath, he asked defendant if he would take an intoxilyzer test, and defendant agreed to do so.

After the intoxilyzer tests and a blood test were administered to defendant, Erlenbush interviewed him a second time. He again questioned defendant about drinking, and the defendant admitted that he may have had two or three beers prior to the accident. The defendant reiterated that he was driving on the proper side of the street and also stated that there was a sidewalk for pedestrians to walk on and that there was a "guy walking down the middle of the road." The defendant did not know exactly how it (his hitting of the victim) happened, but it happened very quickly. According to Erlenbush, the defendant was nervous and excited during the interview, but there was no noticeable slurring of speech. Furthermore, the defendant had no difficulty walking, although Erlenbush had only a very limited opportunity to observe his ability to do so. Erlenbush stated that the only indication of intoxication on the part of defendant, other than the results of the intoxilyzer tests, was the odor of alcohol on his breath.

Tracy Beth Naylor testified that defendant and two companions came to her home in Mt. Pulaski on the evening of August 10, 1981. While at her home, the defendant drank two beers, and two shots of Southern Comfort. In her opinion, the defendant was "loaded," in other words drunk, on that evening. He was "stumbling a little" but did not fall down. The defendant's companions, Bob Montgomery and

Del Wilson, were also drunk, and Naylor had likewise been drinking.

Bob Montgomery stated that he was with defendant from noon until about 10:30 p.m. on the day of Lawrence's death. According to Montgomery, defendant probably drank three or four beers on that day, although he was apparently uncertain about the exact amount of alcohol which defendant consumed. Montgomery had made an earlier statement to Trooper Erlenbush that defendant was "pretty well drunk" on the evening in question and was driving "not too good" after he, defendant, and Del Wilson entered Lincoln on their way back from Naylor's home, but he testified at trial that he did not notice any unusual driving on the part of defendant after the three entered Lincoln. The defendant was not driving at an excessive rate of speed, and did not disobey any traffic signals. Furthermore, Montgomery did not notice that defendant had any difficulty walking on the evening of August 10, 1981, and defendant's speech on that night was "O.K."

Lester K. Petersen, defendant's father, testified for the defense. Petersen is a lineman for CILCO and one of his job duties is the installation and repair of street lights. He is familiar with the streets of Lincoln, and between the time of Lawrence's death and the time of defendant's trial, he made several visits to the area where Lawrence was killed. He made measurements, noted the location of buildings and made a drawing of the area. According to Petersen, there were no pedestrian crosswalks in the vicinity. Petersen also made detailed estimates of the location and extent of shadows caused by the placement of street lights in relation to trees in the area of the accident. The effect of the location of the street lights is that a motorist approaching the scene of Lawrence's death, from the direction in which defendant was traveling on the night of the accident, passes from shadow into light into shadow.

The defendant, testifying on his own behalf, stated that on the afternoon of August 10, 1981, he, Bob Montgomery, and Del Wilson played frisbee in Memorial Park in Lincoln, and had some beers there. The defendant drank about four or five beers in the park before proceeding, at about sunset, to Tracy Naylor's home in Mt. Pulaski in the company of his two friends. While at Naylor's home, defendant had several more beers, and one drink of Southern Comfort. After about an hour and a half at the Naylor residence, they returned to Lincoln via country roads. By the time defendant and his friends left the Naylor home, defendant had consumed seven to nine beers, but he was not drunk, was not sick, and felt fine when he left Mt. Pulaski. On the way back to Lincoln, he had no difficulty finding his way, seeing or keeping his car on the road. He first took Wilson home, and then

dropped off Montgomery before proceeding to his home. He had no difficulty locating the homes of his friends or in driving his car, which was in good mechanical condition. After dropping off Montgomery, he turned onto Ottawa Street. He was driving down the righthand side of the street at about 30 miles per hour and was not swerving his car. There were no cars parked on the right side of the street but there were some cars on the left side. Suddenly, a "motion" came across his side of the road, he felt a thump or thud in front of the car, fragments of windshield glass came into the passenger compartment, and the windshield on the passenger side of the car was shattered. The last thing defendant remembered doing at the scene of the accident was hitting his brakes. The next thing he remembered was "picking [his] head off the steering wheel at [his] residence." He did not remember what happened in the intervening period. He got out of his car and walked around it, wondering how he had gotten there. When he saw the front of his car, it occurred to him that he may have hit a person. He ran back to the scene of the accident, where he saw an ambulance and squad cars, and then ran back to his home, told his mother that he had had an accident, that he thought that he may have hit someone, and had started to call the police when Sergeant Hill knocked on the door.

On cross-examination, the defendant admitted that he knew a college campus was on both sides of the street where the accident occurred and that there was heavy pedestrian traffic in the area. He had his bright lights on at the time of the accident and did not know whether he came to a complete stop after the impact. When he arrived at his residence, he noticed that he had a sore knee, a slight headache, and glass in his hair. He did not know why he did not stop at the scene of the accident and immediately report his involvement to the police.

Section 9—3(a) of the Criminal Code of 1961 provides in pertinent part:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving of a motor vehicle, in which case the person commits reckless homicide." (Ill. Rev. Stat. 1981, ch. 38, par. 9—3(a).)

In order to secure a reckless homicide conviction, the State must prove that a defendant recklessly drove a motor vehicle in a

manner likely to cause death or great bodily harm. (*People v. La-Combe* (1982), 104 Ill. App. 3d 66, 432 N.E.2d 672.) Recklessness is defined as conscious disregard of a substantial risk that one's acts are likely to cause death or great bodily harm to an individual, where the disregard constitutes a gross deviation from the standard of care which a reasonable person would have utilized in the situation with which the defendant was confronted. (*People v. Walljasper* (1981), 97 Ill. App. 3d 81, 422 N.E.2d 251.) Criminal liability does not attach to every negligent act resulting in the death of another, but only to acts of such a reckless or wanton character as to be indicative of an utter disregard for the safety of others under circumstances likely to cause injury. *LaCombe.*

As support for the assertion that he was not proved guilty of reckless homicide beyond a reasonable doubt, defendant relies principally on *LaCombe, Walljasper*, and *People v. Friesen* (1978), 58 Ill. App. 3d 180, 374 N.E.2d 15, all cases in which the defendant's reckless homicide conviction was reversed. In none of these cases, however, was there any conclusive evidence that the defendant was heavily intoxicated or was speeding at the time that his automobile struck and killed the victim. In other words, there was no significant indication that the conduct of the defendants in these cases constituted a gross deviation from the standard of care which a reasonable person would have utilized under the circumstances. For this reason, the behavior of the defendants in the above cases is readily distinguishable from the course of conduct with which we are here concerned.

In the present case, there is unrefuted evidence that at the time of the victim's death, the alcohol content of defendant's blood (.17%) was far above the level of presumptive intoxication (.10%) (Ill. Rev. Stat. 1981, ch. 95½, par 11—501(c)(3)), and that defendant was exceeding the speed limit by 11 mph in the vicinity of a college campus where there was at least a higher than average amount of pedestrian traffic. The evidence as to the actual effect of the alcohol on defendant is in conflict. On the one hand, there is the defendant's testimony that his driving ability was unimpaired on the evening in question and the statements of Bob Montgomery that defendant was driving relatively well after he, Montgomery, and Wilson entered the city of Lincoln on their way back from Mt. Pulaski. On the other hand, there is the testimony of Tracy Naylor that the defendant was "loaded" and that he was "stumbling a little" when he left her home to return to Lincoln. Furthermore, the veracity of Montgomery's testimony on this point is undercut by his earlier statements to Trooper Erlenbush that the defendant was driving "not too good" after he entered Lincoln

and that he was "pretty well drunk" on the evening in question. In our opinion, this conflicting evidence created a jury question as to the effect of the liquor on defendant. The jury was justified in believing that the alcohol had quite a significant impact on defendant and substantially impaired his driving ability, and in disregarding conflicting testimony. See *People v. Jones* (1971), 2 Ill. App. 3d 575, 277 N.E.2d 144; *People v. Coolidge* (1970), 124 Ill. App. 2d 479, 259 N.E.2d 851.

It is reasonable to assume that the dulling effect of the alcohol on defendant's reflexes, along with the excessive speed at which he was driving, was the cause of Lawrence's death. The few seconds' delay in defendant's ability to bring his car to a stop, occasioned by his dulled reflexes stemming from his intoxication and the excessive speed at which his automobile was traveling, may well have meant the difference between life and death for Ralph Lawrence. The defendant's action of driving his car at an excessive rate of speed in an area heavily traversed by pedestrians, while intoxicated to the extent that his driving ability was seriously impaired, was beyond a reasonable doubt likely to cause death or great bodily harm to pedestrians in the area, and in so doing defendant demonstrated an utter disregard for the safety of such persons. We therefore affirm defendant's reckless homicide conviction.

Affirmed.

GREEN, P.J., and MILLS, J., concur.