2019 IL App (1st) 163247

FIRST DISTRICT
FOURTH DIVISION
August 8, 2019

No. 1-16-3247

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| | ) | No. 14 CR 11107 |
| WALTER WELLS, | ) ) | |
| Defendant-Appellant. | ) ) ) ) | The Honorable Matthew E. Coghlan, Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Walter Wells, appeals his convictions of aggravated criminal sexual abuse and aggravated battery in a public place. Defendant was sentenced to two concurrent terms of three years' imprisonment. On appeal, defendant contends that the evidence presented was insufficient to sustain his convictions because (1) the victim's testimony was incredible and uncorroborated and (2) the State failed to prove the battery occurred on public property. Defendant also argues that the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2014)) violates substantive and procedural due process. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In June 2014, defendant was indicted in the present case with one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(f) (West 2014)) and two counts of aggravated battery (*id.* § 12-3.05(c)) of K.A., a minor at least 13 years old but under 18 years old. At the same time, defendant was also charged in five other cases involving similar allegations. After his convictions in the present case, the State nol-prossed the other charges.

¶ 4        At trial, K.A. testified that from 2011 to 2015, she attended Hubbard High School located in Chicago, Illinois. She was 19 years old at the time of trial. She identified defendant as a security guard at the school and a coach of the girls' swim and water polo teams at her school. Defendant's security post was at the back entrance of the school. K.A. testified that in January 2014, K.A. approached defendant to inquire about joining the water polo team. Defendant was sitting at a desk at the security post at the back entrance. K.A. testified that defendant responded that practices would start in the coming weeks and that K.A. could join. K.A. testified that she started to leave, but defendant asked for a hug. K.A. walked around the desk, and defendant stood up. K.A. testified that as defendant hugged her, he slid his hand down from the middle of her back and squeezed her left buttock. K.A. testified that no one else was present. K.A. testified that his conduct made her feel "extremely uncomfortable" and she left.

¶ 5        K.A. testified that after this incident, she saw defendant around the school but did not speak to him because she was scared and also had no reason to speak to him. K.A. testified that in early February 2014, she again spoke to defendant while he was stationed at his post by the back entrance of the school. K.A. testified that defendant was standing in the doorway of the entrance and there were other people in the area. K.A. asked defendant when water polo practice would start; defendant responded that it would start next week or the week after. K.A. testified

that defendant then asked, "where's my hug?" K.A. testified that she gave him a hug, but attempted to position her arms underneath his to avoid being touched again. K.A. testified that defendant moved his arm underneath K.A.'s and used his right hand to squeeze her left nipple with his finger and thumb. K.A. testified that she "smacked his hand away" and then stated, "so practice starts this upcoming week." K.A. testified that defendant responded, "yes, or you can come early and show me what you've got, just don't tell my wife." K.A. testified that she felt scared and uncomfortable and she left. K.A. told her mother in early March 2014. She was interviewed by a detective from the Chicago Police Department on March 4, 2014.

¶ 6        On cross-examination, K.A. testified that she knew defendant as "Jay" and had seen him every day for about a year before the January 2014 incident. She testified that defendant did not ask for a hug or grab her prior to that incident. She believed the January 2014 incident occurred after school and before softball practice on a Monday or a Tuesday. K.A. believed there were approximately 1500 students at her school and approximately 500 were still in the building at 3:45 p.m., when the incident occurred, but she could not recall whether any people were around the back entrance when defendant hugged her. She testified that she did not use the back entrance every day. Sometimes there was one guard and sometimes there were two guards stationed there. She did not know if there were security cameras, but she did not observe any there.

¶ 7        K.A. testified when defendant hugged her in January, he placed his left hand down her back and across to her right buttock. She moved his hand away, but she did not say anything. She told her friend J. what happened. She also testified that she still wanted to join the water polo team even after the hug. She had been on the swim team during the September to November

season. After the incident in February, K.A. did not play or practice on the water polo team. She testified that the February incident occurred after school.

¶ 8        K.A. testified that in 2013 to 2014, her boyfriend was D.P. and he was on the swim team. He was not on the water polo team because he had night school. K.A. testified that the other coach of the water polo team was defendant's wife, Robin, who was also a security guard at the school. Robin coached the girls' swim team while defendant coached the boys' swim team. K.A. testified that she broke up with D.P. after her swim program ended. K.A. denied speaking to Robin about issues with D.P. She denied that Robin and defendant intervened in her relationship with D.P. K.A. testified that she and D.P. had issues before any intervention by Robin or defendant and she did not blame them for the breakup.

¶ 9        The State presented evidence of other crimes through the testimony of J.O. and A.B. In that regard, J.O. testified that she attended Hubbard High School from 2010 to 2014 and identified defendant as a security guard and coach. J.O. testified that defendant was "really friendly" and a "nice guy" when she met him. J.O. testified that early in her freshman year in 2010, defendant was walking with J.O. to the back entrance before school started and while they stood in the hallway near the stairs, defendant reached out for a hug. J.O. testified that she hugged him back, but defendant's arm swiped across her buttocks. J.O. testified that over time, defendant asked for approximately more than 50 hugs and swiped his hand across her buttocks each time. J.O. entered school through the back entrance because that is where the bus dropped her off. She testified that she eventually told the school counselor, Ms. Jones, but J.O. claimed it "was just put under the rug." J.O. later spoke with Detective Lisa Sandoval from the Chicago Police Department on March 4, 2014. J.O. did not inform Sandoval about telling the school counselor.

¶ 10    A.B., another student at Hubbard High School, testified that she saw defendant almost every day, either at the front or rear entrance to the school. A.B. testified that in December 2013 or January 2014, she attended a boys' basketball game after school with her boyfriend, A. During the game, A.B. went to the vending machine in the hallway near the back entrance. A.B. testified that as A. and other students stood nearby, A.B. asked defendant for money to purchase a Pop-Tart from the vending machine. A.B. explained that defendant usually gave students money if they asked. A.B. testified that defendant gave her a dollar and asked for a hug. A.B. testified that when defendant hugged her, his hand trailed down her back and he grabbed her buttocks. A.B. testified that defendant had given her money on 20 to 30 previous occasions but he had never hugged her or touched her butt before. A.B. pulled away, purchased the Pop-Tart, and returned to A., who had observed what had occurred and seemed upset that A.B. did not get angry at defendant. A.B. testified that in early March 2014, she told the school counselor and the principal about the incident but only after she had been called into a meeting regarding defendant.

¶ 11    Sandoval testified that she was assigned to investigate a case involving a security guard at Hubbard High School on March 3, 2014, which was an ongoing investigation involving at least four other girls who had complained of inappropriate touching. On March 10 or 18, witnesses were brought to the office two at a time to be interviewed. Sandoval interviewed each girl individually, with an assistant state's attorney and a representative from the Department of Children and Family Services present. She first talked to K.A. and learned of a prior incident. Sandoval found a prior report in her computer and learned of the names of four other girls. Sandoval arrested defendant at his home on May 30, 2014.

¶ 12    The parties stipulated that Nancy Wiley would testify that she was the principal of Hubbard High School in Chicago from 2010 to 2015, that defendant was employed by the Chicago Public Schools at Hubbard High School as a security guard and boys' water polo and swim coach between 2010 and 2014, and that defendant resigned from the Chicago Public Schools on June 5, 2014. Defendant moved for a directed finding of not guilty, which the trial court denied. The defense then rested.

¶ 13    Following closing arguments, the circuit court convicted defendant of all charges. The circuit court found that the State's witnesses were credible and had no motive to testify falsely. The circuit court observed that although there was no corroborating physical evidence, this was not surprising given the nature of the allegations. The court further found that the investigation revealed similar allegations involving other girls wherein defendant ingratiated himself to the girls, gave hugs, and squeezed their buttocks. Concerning the aggravated criminal sexual abuse charge, the circuit court found that the State had proven that defendant committed the conduct for the purpose of sexual arousal or gratification based on K.A.'s testimony that defendant told her to come early to swim practice to "show him what she had" and to not tell his wife. The circuit court subsequently denied defendant's motion for a new trial.

¶ 14    At the sentencing hearing, Sandoval testified for the State that three other students reported similar incidents to her. She testified that although there were security cameras, the girls were unable to recall the specific days on which the incidents occurred. The victim impact statement of K.A. and another girl were presented to the court. In mitigation, defendant presented the testimony of his wife and his mother. Defendant had no criminal background. In allocution, defendant expressed that he was baffled by the accusations and felt "railroaded" by them. The State pointed out that defendant had been found guilty, that six high school girls accused him of

very similar conduct, and that defendant had resisted arrest. The circuit court found probation was not appropriate given the number of incidents reported. It merged count II, aggravated battery, into count I, aggravated criminal sexual abuse, and sentenced defendant to concurrent terms of three years' imprisonment on count I and count III. Defendant's motion to reconsider sentence was subsequently denied. Defendant filed a timely appeal.

¶ 15                              II. ANALYSIS

¶ 16                        A. Sufficiency of the Evidence

¶ 17        On appeal, defendant challenges the sufficiency of the evidence supporting his convictions on two grounds: (1) the trial testimony was uncorroborated and incredible and (2) with regard to aggravated battery, there was no evidence that the high school was "public property."

¶ 18        "[T]he State carries the burden of proving beyond a reasonable doubt each element of an offense." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *Id.* (citing *Jackson*, 443 U.S. at 318-19). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.* at 225. "This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant was tried before the bench or a jury." *People v. Wise*, 2019 IL App (2d) 160611, ¶ 12.

¶ 19    A defendant commits aggravated criminal sexual abuse if he "commits an act of sexual conduct with a victim who is at least 13 years of age but under 18 years of age and the person is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim." 720 ILCS 5/11-1.60(f) (West 2014). The term "sexual conduct" is defined as any knowing "touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1. The intent to arouse or satisfy sexual desires can be established by circumstantial evidence based on the totality of the circumstances, such as a defendant's statements and actions. *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010); see *People v. Cabrera*, 116 Ill. 2d 474, 492 (1987).

¶ 20    The State establishes the offense of aggravated battery based on the location of the incident upon showing that the defendant committed a battery when "he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or a domestic violence shelter." 720 ILCS 5/12-3.05(c) (West 2014).

¶ 21                          1. Witness Testimony

¶ 22    Defendant argues that the State's evidence was insufficient because K.A.'s testimony was not credible, K.A.'s testimony was uncorroborated by physical evidence or eyewitness testimony, the other victims' testimony was also incredible, all of the victims failed to immediately report the incidents, and Sandoval's testimony was vague.

¶ 23    Reviewing the testimony of K.A. and the other acts witnesses in the light most favorable to the State, as we must, we conclude that sufficient evidence supported defendant's convictions of aggravated battery and aggravated criminal sexual abuse. Defendant argues that K.A.'s testimony was uncorroborated and she was not credible. However, it is well established that "the

testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *Siguenza-Brito*, 235 Ill. 2d at 228. Unequivocal testimony from a single complainant, even absent corroborating physical evidence, is sufficient to sustain a conviction in a sexual crimes case. *People v. Le*, 346 Ill. App. 3d 41, 50-51 (2004) (citing *People v. Morrow*, 104 Ill. App. 3d 995 (1982)).

¶ 24    Here, the circuit court specifically noted that it observed K.A. closely and it found her to be a credible witness. It is for the trier of fact to determine the credibility of the witness; we will not second-guess that determination or retry the case on appeal. *Siguenza-Brito*, 235 Ill. 2d at 228. K.A. was 19 years old at the time of trial and presented clear, unwavering testimony regarding how the two incidents occurred. She recalled without hesitation defendant's statements and actions in squeezing her left buttocks while giving her a hug on one occasion and, on the other occasion, deliberately moving his arm underneath hers and using his right hand to squeeze her left nipple with his finger and thumb and inviting K.A. to "show me what you've got."

¶ 25    In addition, contrary to defendant's argument, the evidence against him did not consist solely of K.A.'s testimony. Rather, both J.O. and A.B. testified to similar incidents occurring between them and defendant. The circuit court also found J.O. and A.B. to be credible witnesses. The evidence thus demonstrated defendant's pattern and practice of ingratiating himself to female students using his position as security guard and coach at the school or by giving them money and then asking for hugs so he could engage in inappropriate touching.

¶ 26    Moreover, the lack of corroborating physical evidence was unsurprising in this case given the nature of the allegations against defendant. That is, there were no physical injuries sustained or other physical evidence involved in the acts. As Sandoval's testimony explained, there was no

video evidence despite the presence of security cameras because K.A. and the other female students could not pinpoint specific dates when the incidents occurred.

¶ 27    Defendant argues that K.A. and the other female students were motivated to testify falsely. The uncontradicted trial evidence, however, reveals no ulterior motivation of K.A. or the other two witnesses to concoct allegations against defendant. K.A. specifically denied that she blamed defendant or his wife for her breakup with her boyfriend. Defendant's argument in this regard "again involves a matter for the trial court to consider in evaluating the credibility of the witnesses." *Le*, 346 Ill. App. 3d at 51. Here, the circuit court specifically held that K.A., along with the other two female students, had no motivation to testify falsely. We thus reject defendant's argument in this respect.

¶ 28    Defendant also contends that the testimony of K.A., J.O., and A.B. should be questioned because they did not promptly report the incidents and J.O. continued to use the same rear entrance despite defendant's post there. Any delay in reporting by K.A. or the other students can be explained by the fact that they all testified to being embarrassed and scared about the incidents and the lack of response when the incidents were reported to the school counselor. Regardless, "[w]hether this delay in making a 'prompt complaint' diminishes the probative value of the accusation is a question for the jury. There is no fixed time limit within which a prompt complaint must be made." *Morrow*, 104 Ill. App. 3d at 1000. Again, we will not substitute our judgment for the trier of fact, which heard the evidence, observed the demeanor of the witnesses, and evaluated the effect of any delay in reporting. *Id.* In addition, that J.O. continued to use the same rear entrance despite defendant's repeated "hugs" can be explained by the fact that J.O.'s bus let her off at the back entrance to the school.

¶ 29    We further observe that K.A.'s testimony provided sufficient evidence of defendant's sexual intent in groping her. K.A. testified that, after defendant pinched her left nipple and she smacked his hand away, he stated that K.A. could come to practice early to "show me what you've got, just don't tell my wife." This statement, coupled with his actions during both incidents, clearly presented unrefuted evidence of defendant's sexual intent.

¶ 30                                2. Public Property

¶ 31    Defendant next argues that the State failed to establish the aggravating factor of his aggravated battery conviction, that is, it failed to present any evidence that Hubbard High School was "public property."

¶ 32    As stated, the offense of aggravated battery based on the aggravating factor of the location of the incident requires a showing that the defendant committed a battery when "he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or a domestic violence shelter." 720 ILCS 5/12-3.05(c) (West 2014). As such, defendant contends his conviction should be reduced to simple battery.

¶ 33    Defendant asserts that the State failed to show that the school was open to the public, which it contends is a necessary component of establishing it is "public property," relying on *People v. Ojeda*, 397 Ill. App. 3d 285 (2009), and *People v. Kamp*, 131 Ill. App. 3d 989 (1985), from the Second and Third Districts, respectively. Defendant argues that the State presented no evidence that the high school was government owned, paid for by taxes, or open to the public. Defendant asserts that although the State presented evidence that Hubbard High School was a Chicago public high school based on the stipulation that Wiley would testify that defendant was employed by the Chicago Public Schools as a security guard at the high school, there was no

evidence that the school was accessible to the public, and the presence of security guards indicates that it was not, and the circuit court made no factual finding whether the school was public property.

¶ 34 The State counters that *People v. Hill*, 409 Ill. App. 3d 451 (2011), from the Fourth District, presents the correct analysis in defining "public property" as "government-owned property." The State also argues that the trial evidence showed that Hubbard High School was a Chicago Public School and was thus public property. Alternatively, the State asserts that this court may take judicial notice of the fact that the school was a Chicago Public School and therefore public property.

¶ 35 The aggravated battery statute does not define "public property." In construing a statute, our primary goal is to effectuate the intent of the legislature by applying the plain, ordinary meaning of the statutory language. *Id.* at 454. If a term is not defined, we assume the legislature intended the term to " 'have its ordinary and popularly understood meaning.' " *Id.* (quoting *People v. Beachem*, 229 Ill. 2d 237, 244 (2008)). In so doing, we may resort to the dictionary definition. *Id.* We must avoid reading into statutory language exceptions, limitations, or conditions that would conflict with the plain language and the legislature's intent. *Id.* Issues of statutory interpretation are reviewed *de novo*. *Id.*

¶ 36 In *Ojeda*, the parties stipulated at trial that the defendant struck a classmate while they were in a high school and that the school was funded by tax dollars. *Ojeda*, 397 Ill. App. 3d at 286. However, the parties disagreed at trial and on appeal as to whether the high school was "public property" under the aggravated battery statute. *Id.* The *Ojeda* court reasoned that "property is not public solely because it is funded by local taxpayers. Rather, 'public' *also* refers to that which is for the public's use." (Emphasis in original.) *Id.* at 287. The *Ojeda* court relied

on the definition of "public building" in Black's Law Dictionary: " '[a] building that is accessible to the public; esp., one owned by the government.' " *Id.* (quoting Black's Law Dictionary 1265 (8th ed. 2004)). Although the stipulated evidence in *Ojeda* established that the school was government-owned, the court found it necessary to also show that the "public high school is for the public's use." *Id.* The court ultimately found that, although public access was limited, the public school was still open to the public and thus the elements of aggravated battery had been satisfied. *Id.* at 287-88.

¶ 37    In discussing the definition of "public property," the Second District in *Ojeda* relied on *Kamp*, 131 Ill. App. 3d at 993, in which the Third District Appellate Court found that the trial evidence established that a battery committed in a park occurred on "public property." The defendant in *Kamp* argued that the State was required to show public ownership of the park. *Id.* The *Kamp* court found that the State presented sufficient evidence of the underlying felony of aggravated battery in establishing that the park was open to the public, regardless of ownership. *Id.* The *Ojeda* court also cited *People v. Ward*, 95 Ill. App. 3d 283, 287-88 (1981). In *Ward*, the Second District found that the State's amendment of the information to state "public place of accommodation" instead of "public property" for an aggravated battery that occurred in a hotel parking lot constituted a formal amendment and not a substantial defect. *Id.* It reasoned that "a battery committed in an area open to the public, whether it be a public way, public property or public place of accommodation or amusement, constitutes a more serious threat to the community than a battery committed elsewhere" and

"the essential allegation *** is that the battery occurred in a public area. Whether the property was actually publicly owned and, therefore, 'public property' rather than a

privately owned 'public place of accommodation' is irrelevant; what is significant is that the alleged offense occurred in an area accessible to the public." *Id.*

¶ 38 In contrast to *Ojeda*, the Fourth District in *Hill*, 409 Ill. App. 3d at 455, found the Second District's definition of "public property" too restrictive, *i.e.*, that it must be funded by taxpayers and open for use by the general public. The defendant in *Hill* argued that the jail pod where the battery occurred did not constitute "public property" for purposes of aggravated battery because it was not open to the public, citing *Ojeda*. *Id.* at 453-54. The *Hill* court concluded that the Second District in *Ojeda* improperly relied on the definition of "public building" in defining "public property" under the statute and thus substituted "public space," "public place," and area "open or accessible to the public" for the term "public property." *Id.* at 455. The Fourth District in *Hill* observed that "[n]othing indicates the General Assembly meant for the plain and ordinary meaning of 'public property' to be anything other than government-owned property." *Id.* The Fourth District defined "property" as " 'something owned or possessed; *** a piece of real estate' " and "public land" as " 'land owned by a government.' " *Id.* at 454 (quoting Merriam-Webster's Collegiate Dictionary 933, 942 (10th ed. 2000)). Accordingly, the court concluded that "the plain and ordinary meaning of 'public property' is property owned by the government." *Id.* Thus, the assault in the jail pod occurred on public property for purposes of the aggravated battery statute. *Id.* The court additionally observed that the jail "is property used for the public purpose of housing inmates." *Id.* at 455.

¶ 39 Similarly, we observe that in *People v. Messenger*, 2015 IL App (3d) 130581, ¶ 23, the Third District upheld an aggravated battery conviction where the evidence established that the battery occurred in a county jail owned by the government and was therefore considered public property. The *Messenger* court distinguished *Kamp* and *Ward* on grounds that, to the extent they

characterized ownership as irrelevant, "these discussions were in the context that public property, for purposes of the statute, need not necessarily be publicly owned." *Id.* ¶ 21.

¶ 40    Turning to the present case, and viewing the evidence in the light most favorable to the State and making all inferences from the evidence in favor of the State, we find it was sufficient to establish that Hubbard High School was a public school, and as a government-owned entity, it was therefore "public property" within the meaning the aggravated battery statute. In the present case, the evidence showed that the battery occurred in Hubbard High School, where K.A. was a student and defendant was employed. The parties stipulated that Wiley, the principal of the high school, would testify that defendant was employed by the Chicago Public Schools as a security guard and coach at Hubbard High School during the relevant time period. In the same way that the jail in *Hill* was "public property" that was government owned and used "for the public purpose of housing inmates," the high school here was a public school, which was used for the public purpose of educating children.

¶ 41    Moreover, even utilizing the analysis the *Ojeda* court applied to the public school at issue in that case, the evidence here also showed that Hubbard High School was "open to the public," even if access was limited. As defendant points out, there were security guards stationed at the entrances, but there was no evidence that members of the public were completely barred from entering the public school. *Ojeda* discussed the fact that public schools are "open to the public" even if use or access may be restricted to some extent. "[O]ur supreme court has recognized that public schools are used not only to educate children but, also, to provide space for public functions." *Ojeda*, 397 Ill. App. 3d at 287-88; see also *People v. Childs*, 305 Ill. App. 3d 128, 139-40 (1999) (observing that a jail and a courthouse are "public property" under the aggravated battery and aggravated assault statutes).

"Certainly, if a jail is considered 'public property,' a public high school, with much less security and fewer rules in place, is 'public property.' Moreover, much like a courthouse, a public high school has security to keep those inside the facility safe. Courthouses and public schools implement rules that may deny admittance to some, but those rules are in place not to restrict the public's access but to ensure that order is kept." *Ojeda*, 397 Ill. App. 3d at 288.

¶ 42     Although we find the trial evidence sufficient to establish this element of aggravated battery, we note that the State asks us to take judicial notice of the fact that Hubbard High School is a public school and therefore public property. In support, the State submits a 2018 school progress report for the Chicago Public School of Hubbard High School and refers us to the Chicago Public School's profile of Hubbard High School on its website. "A reviewing court may take judicial notice of factual evidence when the facts are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy." *People v. Spencer*, 408 Ill. App. 3d 1, 10 (2011); see *Hill*, 409 Ill. App. 3d at 456 (courts can take judicial notice of a fact even where it constitutes an element of the offense); Ill. R. Evid. 201(f) (eff. Jan. 1, 2011). In *Spencer*, the appellate court took judicial notice that the high school was a public school and its parking lot was therefore public property where the State submitted a registration form for the school. *Spencer*, 408 Ill. App. 3d at 10. Although we need not resort to taking judicial notice in this case, we agree with the State that such an avenue would be available to us.

¶ 43     Accordingly, we find that there was sufficient evidence to prove beyond a reasonable doubt that defendant was guilty of aggravated criminal sexual abuse and aggravated battery in that evidence showed he committed the alleged acts and the battery occurred on public property for purposes of the aggravated battery conviction.

¶ 45        Defendant argues that the broad SORA regulations and restrictions imposed on him as a result of his conviction for a sexual offense violate his substantive due process rights and are facially unconstitutional.[1] He argues that SORA cannot survive under rational basis or strict scrutiny review as the SORA requirements are not narrowly tailored to achieve a compelling state interest or rationally related to the purpose of protecting the public from sex offenders. Defendant also asserts that the SORA restrictions violate the right to procedural due process as they fail to afford him an individualized assessment of whether he should be required to register.

¶ 46        On appeal, challenges to the constitutionality of a statute are subject to *de novo* review. *People v. Mosley*, 2015 IL 115872, ¶ 22. We presume a statute is constitutional and a defendant must overcome this strong presumption by clearly establishing its invalidity. *Id.* "A court will affirm the constitutionality of a statute or ordinance if it is 'reasonably capable of such a determination' and 'will resolve any doubt as to the statute's construction in favor of its validity.' " *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 20 (quoting *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20).

¶ 47        However, we must first address a jurisdictional issue raised by the State. The State contends that under recent Illinois Supreme Court precedent in *People v. Bingham*, 2018 IL 122008, a defendant cannot raise a constitutional challenge to SORA on direct appeal from the criminal conviction that triggered application of SORA.

¶ 48        In *Bingham*, the defendant was convicted of theft, which was the conviction on direct review, but he had a prior conviction from 1983 for attempted criminal sexual assault. *Id.* ¶ 1.

---

[1]By virtue of defendant's conviction for aggravated criminal sexual abuse, he is classified as a "sexual predator" under the SORA and subject to its registration requirements and other restrictions. 730 ILCS 150/2(E)(1), 7 (West 2014).

Although he was not required to register as a sex offender at the time of the 1983 conviction, later amendments to SORA imposed a registration requirement upon his subsequent theft conviction. *Id.* ¶ 10. On appeal, the defendant challenged the constitutionality of the registration requirement as applied to him on substantive due process grounds and argued that it violated *ex post facto* principles. *Id.* ¶ 14. The supreme court found it lacked jurisdiction to address the defendant's constitutional claims on the merits, reasoning that, in a criminal case, "[a] notice of appeal confers jurisdiction on an appellate court to consider only the judgments or parts of judgments specified in the notice." (Emphases and internal quotation marks omitted.) *Id.* ¶ 16. Citing Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967), the court observed that "the scope of appellate review is defined by the trial court's judgment and the proceedings and orders related to it." *Bingham*, 2018 IL 122008, ¶ 16. Rule 615(b) provides that a reviewing court may:

> "(1) reverse, affirm, or modify the judgment or order from which the appeal is taken;

> (2) set aside, affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken;

> (3) reduce the degree of the offense of which the appellant was convicted;

> (4) reduce the punishment imposed by the trial court; or

> (5) order a new trial." Ill. S. Ct. R. 615(b) (eff. Jan. 1, 1967).

¶ 49 The court in *Bingham* determined that, because the requirement to register under SORA was not encompassed within the trial court's judgment of guilt on the theft conviction or any order of the trial court in that proceeding, the defendant's constitutional challenge did not ask the reviewing court to take action available to it under Rule 615(b). *Bingham*, 2018 IL 122008, ¶ 17.

"The requirement that defendant register as a sex offender is not encompassed within the judgment or any order of the trial court. Thus, defendant's argument did not ask a reviewing court to reverse, affirm, or modify the judgment or order from which the appeal is taken. Nor did it ask to set aside or modify any 'proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken.' Ill. S. Ct. R. 615(b)(2) (eff. Jan. 1, 1967). The requirement that defendant register as a sex offender cannot be fairly characterized as a 'proceeding.' " *Id.*

¶ 50 Accordingly, our supreme court concluded that

"a reviewing court has no power on direct appeal of a criminal conviction to order that defendant be relieved of the obligation to register as a sex offender when there is neither an obligation to register imposed by the trial court nor an order or conviction that the defendant is appealing that is directly related to the obligation or the failure to register."

*Id.* ¶ 18.

The court observed that even if it accepted the defendant's argument that the registration requirement constituted "punishment," "it would not be 'punishment imposed by the trial court.' " *Id.* The court reasoned that "[a]llowing defendants to challenge the collateral consequences of a conviction on direct appeal would place a reviewing court in the position of ruling on the validity (or resolving the details) of regulatory programs administered by state agencies and officials that are not parties to the action." *Id.* ¶ 19. The supreme court explained that such challenges can instead be brought on direct appeal in a case finding a defendant guilty of violating a SORA requirement or by pursuing his constitutional claim in a civil suit. *Id.* ¶ 21.

¶ 51 Based on *Bingham*, we conclude that we lack jurisdiction to review defendant's constitutional challenges to SORA on direct appeal from his criminal convictions. Defendant's obligation to register as a sex offender and comply with the other restrictions and requirements of SORA are collateral consequences of his convictions. *Id.* ¶¶ 10, 19. As a result, they were not imposed by the trial court or embodied in its judgment. "[C]ollateral consequences are effects upon the defendant that the trial court has no authority to impose and that result from an action that may or may not be taken by an agency that the trial court does not control." *People v. Denis*, 2018 IL App (1st) 151892, ¶ 97 (citing *People v. Delvillar*, 235 Ill. 2d 507, 520 (2009)). The trial court's order sentencing defendant in this case does not require him to register as a sex offender under SORA. Our scope of review on appeal is confined to the trial court's judgment (and related proceedings and orders) under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967). As such, defendant's arguments that challenge the collateral consequences of his conviction, which were not imposed by the trial court and were not part of its judgment, are beyond our scope of review, and we therefore dismiss them. The trial court did not impose upon defendant the obligation to register as a sex offender, and this appeal has no direct relation to the obligation to register, failure to register, or failure to abide by any other SORA requirements.

¶ 52 Defendant argues that *Bingham* is distinguishable because, in that case, the sex offense that resulted in his registration requirement was not the conviction on appeal before the court. Defendant contends that in contrast, the requirement to register as a sex offender and comply with other aspects of SORA were triggered by his conviction of criminal sexual abuse and are thus part of the judgment being appealed in this case as that is the conviction on direct review and the requirements are directly related to his conviction of criminal sexual abuse. We disagree with defendant's argument. Several cases from the First District have found *Bingham* controls

under the same circumstances presented here. See *People v. Christian*, 2019 IL App (1st) 153155, ¶¶ 9-17 (on direct appeal from his conviction of aggravated criminal sexual abuse, the court dismissed the defendant's arguments that SORA violated his substantive and procedural due process rights and was punitive and violated the proportionate penalties); *People v. McArthur*, 2019 IL App (1st) 150626-B, ¶¶ 42-46 (on direct appeal from his conviction of aggravated criminal sexual abuse, the court dismissed the defendant's facial and as-applied constitutional challenges to SORA); *Denis*, 2018 IL App (1st) 151892, ¶¶ 95-100 (on direct appeal from his convictions of criminal sexual assault and aggravated criminal sexual abuse, the court found no jurisdiction to review the defendant's challenges to SORA on procedural and substantive due process grounds). As the *Bingham* court observed, defendant may obtain relief from his obligation to register and comply with SORA by securing reversal of his convictions that triggered his SORA obligations or pursuing a civil suit. *Bingham*, 2018 IL 122008, ¶ 21.[2]

¶ 53                                III. CONCLUSION

¶ 54        For the reasons set forth above, we affirm the judgment of the circuit court.

¶ 55        Affirmed.

_____

[2]Even if we had jurisdiction to consider defendant's arguments, we observe that Illinois courts have repeatedly held that SORA does not affect fundamental rights, SORA is rationally related to a legitimate state interest of protecting the public from sex offenders, and no additional procedures are necessary to comply with procedural due process rights. See *In re J.W.*, 204 Ill. 2d 50, 66-72 (2003) (no violation of substantive due process); *People v. Cornelius*, 213 Ill. 2d 178, 204 (2004) (finding no substantive due process violation as there was a rational basis for requirement of disclosing sex offender registration information online); *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶¶ 71-92 (SORA did not impact fundamental rights or violate substantive or procedural due process rights of the defendant); *People v. Lee*, 2018 IL App (1st) 152522, ¶¶ 48-53 (SORA does not implicate a fundamental right and did not violate defendant's substantive or procedural due process rights); *People v. Parker*, 2016 IL App (1st) 141597, ¶¶ 78-82 (SORA statutory scheme does not violate due process); *People v. Rodriguez*, 2018 IL App (1st) 151938-B, ¶¶ 30-35 (SORA statutory scheme is not punitive, SORA is not facially unconstitutional as it is rationally related to legitimate government interest of protecting public from sex offenders, and it is not unconstitutional as applied to defendant); *In re A.C.*, 2016 IL App (1st) 153047, ¶¶ 35-66 (SORA does not implicate a fundamental right, application to a juvenile offender was rationally related to a legitimate state interest, and registration and notification requirements did not violate procedural due process).

**No. 1-16-3247**

| | |
|---|---|
| **Cite as:** | *People v. Wells*, 2019 IL App (1st) 163247 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-11107; the Hon. Matthew E. Coghlan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Pamela Rubeo, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People. |