2026 IL App (3d) 240690

Opinion filed February 10, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellee, | ) | Kankakee County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-24-0690 |
| | ) | Circuit No. 24-CF-317 |
| TAYONNA HARVEY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Judge Kathy Bradshaw-Elliott, |
| | ) | Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Peterson and Bertani concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Following a jury trial, defendant, Tayonna Harvey, was convicted of criminal sexual abuse

pursuant to section 11-1.50(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.50(a)(1)

(West 2024)) and sentenced to sex offender probation for a period of 30 months. Defendant

challenges her conviction on appeal, arguing that the State failed to prove beyond a reasonable

doubt that defendant used force or the threat of force to commit an act of sexual conduct. For the

reasons set forth below, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3 Defendant was charged with one count of criminal sexual abuse (*id.*), alleging that, on February 3, 2024, she "knowingly committed an act of sexual conduct with [M.P.], in that said defendant, by the use of force, intentionally touched [M.P.'s] vagina with her hand, for the purpose of the sexual arousal of the defendant." Defendant pleaded not guilty.

¶ 4 The jury trial commenced on August 19, 2024. The State called M.P. as its first witness, who testified as follows. On February 3, 2024, M.P. went to a local bar called Jensen's with Florence Lane, Kahdijah Waiters, and Martesha Finch to celebrate Lane's birthday. M.P. did not consume alcohol prior to arriving at Jensen's but drank one shot and part of one mixed drink at the bar. M.P. was wearing a "short black dress" and was not wearing underwear. M.P. physically indicated the length of her dress as "a third of the way between her hip and knee."

¶ 5 Music played throughout the bar, but there was no designated dance floor. People were dancing "[w]herever they could." At some point, M.P. began dancing and defendant "bumped into [M.P.] really hard" but did not stop. Defendant then approached M.P. a second time and "inserted [defendant's] left finger in [M.P.'s] vagina." M.P. felt "disgusted, puzzled," and "violated." M.P. confronted defendant and asked her why she touched her, to which defendant responded, "I like girls, I like p***, I finger b***." Thereafter, defendant approached Waiters, put her finger in Waiters's face, and said, "smell your best friend's p***." M.P. explained that this was a slang term for vagina. At that point, Finch noticed the commotion and asked defendant why she touched M.P., and defendant denied doing so. Defendant "became very aggressive and loud," her eyes bulged, and she had veins protruding from her neck. M.P. interjected that defendant had touched her without permission, and defendant stated, "okay, I touched her, your friend p*** stink." M.P., Finch, and defendant eventually ended up outside in the parking lot of Jensen's and got into a physical altercation. M.P. and her friends left Jensen's before the police arrived.

¶ 6    M.P. did not report defendant's conduct to the police until May 2024 because she "had to build up the courage" to do so and was deciding whether she wanted to pursue legal action. M.P. was concerned that she would be judged, and she was embarrassed.

¶ 7    On cross-examination, M.P. explained that defendant approached her from behind and that she was unaware of defendant's presence. M.P. was dancing by herself and described the dance style as "twerking," which she agreed meant that "you kind of bend over and you shake your rear end." She denied coming into contact with other people while she danced. She further denied "twerking and grinding on" defendant. M.P. confirmed that defendant loudly said she "smelled bad" and that she was embarrassed. M.P. stated that her dress lifted as she was dancing but that, despite not wearing underwear, her genitals were never exposed.

¶ 8    The State called Finch as its next witness. Finch testified that she had known M.P. for approximately nine years. She stated that M.P. was dancing by herself at Jensen's. M.P. was not intoxicated. Finch, M.P., Lane, and Waiters were already inside Jensen's when defendant arrived, at which point defendant told the group that they were pretty and walked away. Finch explained that defendant later approached the group again, tapped Waiters on the shoulder, and "put her fingers in her face like smell your friend p***, it stink." Immediately after, M.P. came to Finch looking upset and said, "this b*** just touched my p*** and I don't play like that because I don't like girls." Finch confronted defendant, and defendant stated, "yeah, I touched her, I always touch p***." Finch detailed the physical altercation that ensued in the bar's parking lot. The following day, Finch received phone calls and text messages informing her that defendant had "tagged" Waiters in a Facebook Live video.

¶ 9    On cross examination, Finch acknowledged that, as M.P. was dancing, she was slightly bent over but "[n]ot a whole lot." Her legs were not "all the way together," but they were not "all

3

the way open" either. M.P.'s dress did not rise over her buttocks as she danced. Finch did not see defendant touch M.P.

¶ 10    The Facebook Live video broadcasted by defendant the day after the incident was admitted into evidence and contained the following. Defendant stated, "You know me, I'm always smelling a b*** p***. I like p***. I'mma smell some p***, I'mma rub some p***. That's what I get, though. Just because a b*** look good don't mean her p*** good." She continued to say that she rubbed M.P.'s vagina and then, in the video, mimicked smelling her hand and described an unpleasant odor. Defendant stated that she got into a fight because she said M.P.'s "p*** stink." She further explained that she "put [her] hand in the p*** like," and gestured with two fingers towards the camera, and then put her hand to her nose. She stated that she said, "you can grab mine. I don't know what you wanna go p*** for p*** or something." She also said, "If I smelled the wrong p***, don't be mad at me. Wash your p***."

¶ 11    The State's next witness was Bryce Hale, a patrol officer with the Kankakee Police Department. He testified that, on May 13, 2024, he took M.P.'s report concerning the incident on February 3, 2024. He learned that M.P. had been sexually assaulted at a local bar, and M.P. provided him with the video. He prepared the report but was not involved in the follow-up investigation.

¶ 12    The State rested. The defense moved for a directed verdict, which the court denied.

¶ 13    Pascal Joiner was the first witness for the defense. Joiner shares a child with defendant and was also at Jensen's on February 3, 2024. He testified that, although he was trying to "dodge" defendant that night, he did see a "young lady" dancing on defendant in his peripheral vision. He described the young lady as "twerking" with her head down, which prevented him from seeing her full face. Joiner testified that the young lady's buttocks were in contact with defendant. He did not

4

know who she was and could not recall what she was wearing. He stepped away to use the restroom and, when he returned, heard the physical altercation taking place in the parking lot.

¶ 14    During cross-examination, Joiner confirmed that he did not see defendant touch anyone's vagina but that he was not watching defendant the entire time because he left to go to the restroom.

¶ 15    The defense next called Shameka Brown. Brown is defendant's cousin and was with defendant at Jensen's on the date of the incident. Brown testified that she saw a "very intoxicated" woman, who she later identified as M.P., "dancing all around" and that Brown had asked her to move "out of [Brown's] boundaries." M.P. complied with Brown's request and then moved to where defendant was sitting and began dancing. Defendant asked M.P. to move twice, but she did not comply. Eventually, defendant said, "b***, move, you stink." M.P. replied by calling defendant a "fat a*** b***." Brown did not see M.P. physically come into contact with defendant while she danced. Brown did not hear M.P. tell defendant not to touch her or to stop what she was doing, nor did she hear M.P. indicate that defendant lifted her dress.

¶ 16    Brown then observed M.P. leave the bar and, when Brown left the bar herself, saw M.P. and her friends standing in a circle with M.P. saying, "oh, we fittin' to bust this b*** head when she come out, we fittin' to bust this fat a*** b*** head."

¶ 17    On cross-examination, Brown confirmed that, while she did not witness any "sexual foul play" from either woman, she was not always present in the bar with defendant.

¶ 18    The jury found defendant guilty of criminal sexual abuse. Defendant was sentenced to sex offender probation for a period of 30 months. This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, defendant argues that the State failed to prove her guilty of criminal sexual abuse beyond a reasonable doubt because it did not prove that defendant used force or the threat

5

of force when committing an act of sexual conduct. The State counters that force is established where a defendant uses the element of surprise to carry out a sexual act and that defendant did so by approaching M.P. from behind.

¶ 21     It is the State's burden to prove each element of an offense beyond a reasonable doubt. *People v. Wells*, 2019 IL App (1st) 163247, ¶ 18. " 'Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime.' " *Id.* (quoting *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009)). A conviction will not be disturbed "unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Id.*

¶ 22     To the extent questions arise concerning statutory construction, we review these *de novo*. *Grady v. Illinois Department of Healthcare & Family Services*, 2016 IL App (1st) 152402, ¶ 9. "The primary objective of statutory construction is to ascertain and give effect to the legislature's intent. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *People v. Gutman*, 2011 IL 110338, ¶ 12. We interpret the statute as a whole and consider the language at issue in conjunction with other relevant statutory provisions. *Id.* We may not "interpret statutory language in a manner that renders any part of the statute 'redundant' or 'superfluous.' " *Grady*, 2016 IL App (1st) 152402, ¶ 25 (quoting *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 29).

¶ 23     A person commits criminal sexual abuse pursuant to section 11-1.50(a)(1) of the Code when the person "commits an act of sexual conduct by the use of force or threat of force." 720

ILCS 5/11-1.50(a)(1) (West 2024). Section 11-0.1 of the Code defines "force or the threat of force" as follows:

" 'Force or threat of force' means the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:

(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." *Id.* § 11-0.1.

"To prove force, there is no definite standard establishing the amount of force the State must prove and each case must be considered on its own facts." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. The force necessary to prove the offense requires something beyond the force inherent in the sexual contact. See *id.* "[W]e may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred." *Id.*

¶ 24 Defendant argues that the State failed to prove her guilty beyond a reasonable doubt where there was no evidence defendant physically overcame or trapped M.P. or that defendant otherwise used force beyond that which is inherent in the sexual contact that occurred. Defendant continues that M.P. was wearing a short dress without underwear and that defendant, being behind M.P. while M.P. danced, would not have had to physically overcome M.P. in order to touch M.P.'s vagina.

¶ 25 Recognizing that force as defined in section 11-0.1 may be lacking, the State resorts to a "less-often cited example of force" where a defendant utilizes surprise as a means to commit a sexual act. In such cases, the State contends that "the use of force is implied, such that the force

inherent in the act of sexual conduct is all that is required to prove the use of force element." See *People v. Borak*, 13 Ill. App. 3d 815, 820-21 (1973). The State characterizes this as "implied force," a concept first considered in *Borak.*

¶ 26        In *Borak*, the defendant was a gynecologist accused of rape and deviate sexual assault based upon sexual acts committed on a patient during her examination. *Id.* at 816-17. While examining the victim, the defendant asked personal questions about her sexual relations with her husband while manipulating his finger inside her vagina. *Id.* at 817. The victim noticed that the defendant was "breathing heavy and was flushed." *Id.* The victim did not leave the examination table because the defendant was standing beside it, and she was scared because she thought that he was sexually stimulated. *Id.* She closed her eyes and felt defendant's tongue near her vagina. *Id.* She rose up on her elbows but, at the defendant's instruction, laid back down and closed her eyes. *Id.* She then felt defendant's penis enter her vagina, at which time she sat up and got dressed. *Id.* She testified that she was not restrained on the table, the defendant did not have a weapon or threaten or use force against her, and she did not call for help or use force against defendant. *Id.*

¶ 27        The defendant was convicted of rape and deviate sexual assault, both of which required force as charged. *Id.* at 816. On appeal, the court recognized that, "due to the nature of the examination being conducted, defendant was allegedly able to accomplish the acts by surprise," as opposed to the traditional understanding of force. *Id.* at 818. It then considered whether the surprise employed by the doctor somehow "negated" the necessity for force and explored whether "some theory of implied or statutory force can be employed." *Id.*

¶ 28        In considering the rape statute in effect at the time, the *Borak* court noted that, "in certain situations, force can be present where no actual violence was either committed or threatened." *Id.* at 819. Specifically, the rape statute included within the definition of "by force and against her

8

will" the circumstance where the victim was unconscious or had a mental condition that caused the inability to give effective consent. (Internal quotation marks omitted.) *Id.* at 819-20. The court further noted that a committee comment to the deviate sexual assault statute provided that "the force required *** is generally the equivalent of the force required in rape." *Id.* at 818. The court ultimately held that, in cases not involving minors,

> " 'force' in the statutory sense, is present when the victim is incapable of consenting to the sexual act involved because she has been given no opportunity to consent. Force is thus implied when the rape or deviate sexual acts proscribed by statute are accomplished under the pretext of medical treatment when the victim is surprised, and unaware of the intention involved." *Id.* at 820-21.

¶ 29 Defendant argues that *Borak* is inapposite because its holding "is limited to circumstances where a medical professional uses the pretext of medical treatment in order to commit acts of sexual conduct through surprise." Defendant argues that an inherent power imbalance exists between a physician and patient because the patient "often has no way of knowing what is routine procedure and what is a criminal sexual act until after the fact," and thus *Borak*'s holding addresses circumstances in which a doctor takes advantage of a patient's limited consent. Here, M.P. and defendant were not in a professional setting, M.P. was not in an examination room where she would have felt uncomfortable or unable to leave, and M.P. did not provide any limited consent for defendant's touch that was subsequently exceeded. Therefore, defendant concludes, there was no implied force when she touched M.P.

¶ 30 We agree with defendant that *Borak* is unavailing to the State. First, as noted by defendant, the implied force analysis in *Borak* has never been extended beyond the physician-patient context. More significantly, however, the analysis in *Borak* was based upon statutes that are no longer in

9

effect, and the current criminal sexual abuse statute specifically provides for the prosecution of criminal sexual abuse committed by surprise. By contrast, the former rape statute specifically included *within the definition of force* instances where no violence was committed or threatened, including where the victim was unconscious or incapable of consenting. *Id.* at 819-20. Moreover, the committee comments to the deviate sexual assault statute indicated that the force required for rape and deviate sexual assault was the same, and the *Borak* court explicitly relied on these comments in reaching its conclusion. *Id.* at 820.

¶ 31    Under the current statutory scheme for criminal sexual abuse, however, a person commits criminal sexual abuse under section 11-1.50(a)(1) of the Code, when the person commits an act of sexual conduct by the use or threat of force. 720 ILCS 5/11-1.50(a)(1) (West 2024). This is distinct from section 11-1.50(a)(2), where a person commits criminal sexual abuse when the person commits an act of sexual conduct and knows that the victim cannot understand the nature of the act *or is unable to give knowing consent*. *Id.* § 11-1.50(a)(2). We note parenthetically that this conclusion is further supported by the most recent amendment to section 11-0.1 of the Code, which modified the definition of "unable to give knowing consent" to make clear it included "when the victim was *** unaware of the nature of the act such that the victim could not give voluntary and knowing agreement to the sexual act." Pub. Act 104-245, § 50 (eff. Jan. 1, 2026) (amending 720 ILCS 5/11-0.1).

¶ 32    Simply put, section 11-1.50(a)(1) and (a)(2) consists of different ways to commit Class 4 criminal sexual abuse. While subsection (a)(1) requires the use of force, (a)(2) explicitly contemplates the situation presented here (and in *Borak*), where a victim is "unable to give knowing consent" due to the element of surprise or being unaware of the nature of the act. The current statutory language no longer supports interpreting a victim's inability to understand the

10

nature of the act or give knowing consent within the definition of "force" as currently defined in section 11-0.1. Instead, at least as it relates to criminal sexual abuse, these are alternative theories for charging criminal sexual abuse. Moreover, interpreting force to include implied force based on surprise in a section 11-1.50(a)(1) prosecution would render section 11-1.50(a)(2) superfluous, something we should not do. See *Grady*, 2016 IL App (1st) 152402, ¶ 25. Accordingly, *Borak*'s concept of "implied force" has no relevance to a section (a)(1) prosecution for criminal sexual abuse.

¶ 33    In electing to charge defendant under section 11-1.50(a)(1), and not section 11-1.50(a)(2), the State was required to prove "force or threat of force" as defined in section 11-0.1 of the Code. Section 11-0.1 contemplates some level of *physical* force, or the threat thereof, to prove criminal sexual abuse. Here, the State presented no evidence that, beyond the force inherent in the sexual contact, defendant threatened M.P., physically overcame or restrained her, or otherwise confined her. While there is no particular standard for the force required to prove criminal sexual abuse, in this case, there was no evidence of any force used in touching M.P.'s vagina. Although it is undisputed that defendant did, in fact, commit an act of sexual conduct against M.P., defendant's actions in approaching M.P. from behind while M.P. danced and surprising her with the sexual conduct does not fall within the definition of "force" under section 11-1.50(a)(1). Rather, it is conduct that arguably falls within the uncharged criminal sexual abuse offense provided for in section 11-1.50(a)(2).

¶ 34    Recognizing the possibility that the concept of implied force does not apply to criminal sexual assault as charged under 11-1.50(a)(1), the State alternatively argues that the evidence at trial was sufficient to satisfy 11-1.50(a)(1)'s force requirement because, in addition to "rubbing" M.P.'s vagina, defendant engaged in an additional act of digital penetration. Specifically, the State

11

argues that the "rubbing" constituted the "sexual conduct" under section 11-1.50 of the Code, and the digital penetration established the use of force that was not inherent in the "rubbing" conduct. However, because defendant was only charged under section 11-1.50(a)(1), which requires a showing of knowing touching or fondling of the victim's sex organ by force, we limit our analysis to the force utilized to accomplish the charged conduct. We therefore reject the State's argument on this point.

¶ 35        In sum, the State failed to prove beyond a reasonable doubt that defendant used force or the threat of force when committing an act of sexual conduct as charged under section 11-1.50(a)(1). Given the insufficiency of the evidence, we must reverse defendant's conviction for criminal sexual abuse.

¶ 36                                III. CONCLUSION

¶ 37        For the reasons stated herein, we reverse the judgment of the circuit court of Kankakee County.

¶ 38        Reversed.

---

*People v. Harvey*, **2026 IL App (3d) 240690**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 24-CF-317; the Hon. Kathy Bradshaw-Elliott, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Vaidehi Suriyanarayanan, of State Appellate Defender's Office, of Ottawa, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James Rowe, State's Attorney, of Kankakee (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---